## JONES v. THE STATE.

| | |
|---|---|
| 64 | 473 |
| 135 | 258 |
| 64 | 473 |
| 148 | 263 |
| 64 | 473 |
| 154 | 248 |
| 154 | 650 |
| 154 | 661 |
| 64 | 473 |
| 157 | 385 |

CRIMINAL LAW.—*Murder.—Evidence.—Previous Assault.—Cautiousness of Deceased. Motive.—Opportunity.*—On the separate trial of a defendant, who was indicted jointly with A., B., C. and D., for the murder of one toward whom all but D. harbored ill-will engendered by adverse interests in a certain estate, wherein it appeared by the evidence that the deceased was murdered, of an evening, while entering his residence, which was in town, and that, long previous thereto, but after such ill-will had arisen and while the deceased was living elsewhere, he had been seriously injured by missiles exploded in his house by the defendant, it was competent to prove, that, during all of the time elapsing between such explosion and the murder, except on the evening of the murder, the deceased had always entered his residence before dark, and that he and his family never ventured out of the house after dark, but fastened the doors, and slept up stairs.

SAME.—*Threats Toward Deceased's Family, and Proposition of Compromise, after Murder.—Malice.*—It was competent, on such trial, as tending to show malice, to prove, that, after the murder, the defendant proposed that the family of the deceased, if they would make a certain compromise in relation to such estate, might return to their former home unmolested, and vaguely threatening them if they did not comply.

SAME.—*Declarations of Accomplice.—Conspiracy.*—D. having pleaded guilty as charged in the indictment, and having testified, that, pursuant to a common purpose to commit the murder, means similar to those used in committing the murder were prepared by the others, in the absence of C., on the day it was committed, that the defendant had threatened to kill the deceased, and had tried to induce the witness to do the killing, and that A. and B., having left C., D. and the defendant, with the understanding that they two were to kill the deceased, had returned declaring that they had done so, it was competent to give in evidence a conversation had between the witness and C., after such preparations and before the murder, and in the absence of the defendant, relative to the proposed murder.

SAME. -*Conduct of Defendant Toward Witness, after Murder.—Impeachment of Witness.—Evidence.*—The conduct of the defendant, after the murder, in causing the arrest of the witness, D., for another crime, his explanation thereof to D., and his furnishing the latter with money to leave the State, was competent, on his re-examination, as explaining his relations with the defendant.

arrest, which was developed by the cross-examination.

SAME.—*Intimidation of Witness.*—It having been developed on the examination of a witness for the State, that her testimony on the preliminary ex-

amination contradicted her present testimony, it was competent to prove, by her, threats made by the defendant to be, and which were, communicated to her by D., prior to her former testimony.

SAME.— *Weapon Carried by Defendant to Intimidate.*—Such witness having testified that the defendant, on informing her that she was to be indicted for perjury, had declared to her, on her proposing to him to confess the perjury, that " he had a revolver in his boot for all who went back on him," it was competent to prove, that, on the day of his arrest, he was armed as he had so declared.

SAME.—*Declarations of Accomplice.—Conspiracy.*—Declarations by B., made while armed and in company with the defendant, and during the pendency of a lawsuit in regard to such estate, which indicated a lying in wait for the deceased, were competent evidence, as tending to establish the conspiracy testified to by D.

SAME.—*Transcript of Record.—Harmless Evidence.*—The transcript of the record of such cause, made on a change of the venue thereof, though incompetent, was harmless evidence.

SAME.—*Threats and Admissions of Third Person.*—Threats made by a third person to kill the deceased, and admissions by him that he had procured D. to commit the murder, were not competent evidence for the defence.

SAME.- *Res Gestæ* —Declarations by a third person, accompanying acts tending to show that he, and not the defendant, had committed the murder, would be competent evidence for the latter.

SAME.—*Intimidation of Witness by Other Witnesses.—Impeachment of Witness.*—It is incompetent for a witness for the defendant to state what means, if any, had been used by witnesses for the State to prevent him from testifying, where no ground for their impeachment has been laid.

SAME.—*Instruction to Jury.—Matters of Fact.*—It is proper to refuse to give an instruction which embraces a theory of defence founded on matter of fact solely, without any statement of the rules of law applicable thereto.

SAME.—*Failure of the Theory of the State.*—Where the evidence of the crime is largely circumstantial, as against the defendant, some of it tending to sustain the theory advocated by the State, and some a different theory, but each theory tending to implicate the defendant, it is proper to refuse to instruct the jury, that, if they have a reasonable doubt of the truth of the State's theory, the defendant should be acquitted.

SAME.—*Crime Procured by Conspirators.—Alibi*—It appearing from the evidence in such case that the murder had been committed pursuant to a conspiracy so to do by the parties indicted, though possibly by the hand of some one not a party to the conspiracy, it was proper to instruct the jury that the defendant and his " confederates " (those indicted with him), though not present at the murder, might yet be guilty as conspirators.

SAME.— *Credibility of Accomplice as a Witness.*—It was proper to refuse to

Jones v. The State.

instruct the jury, in relation to the credibility of a confessed accomplice who had testified, that formerly, under the law as it then was, he would not have been allowed to testify.

SAME —*Credibility of Witness Admitting Former Perjury.*—It is proper to refuse to instruct the jury, in relation to the testimony of a witness who has confessed to having testified falsely on a former trial ; because of fear of some person, that the jury should reject such testimony if, in their opinion, there were no facts existing sufficient to inspire such fear.

SAME.—*Opinion of Judge.—Capital Punishment.*—A defendant, on trial for murder, can not complain of an instruction which indicates that the court is opposed to capital punishment.

SAME.—*Harmless Refusal.*—Where the substance of an instruction asked is embraced in one given, the refusal is harmless.

From the Monroe Circuit Court.

*C. F. McNutt,* for appellant.

*T. W. Woollen,* Attorney General, *R. W. Miers, G. W. Friedley, G. Putnam, F. Wilson, M. F. Dunn, J. W. Buskirk, H. C. Duncan, J. L. Meginity* and *T. B. Buskirk,* for the State.

WORDEN, J.—The appellant, Alonzo B. Jones, and Lee Jones, Milton P. Toliver, Thomas Toliver and Eli Lowry, were jointly indicted in the Orange Circuit Court, for the murder, in the first degree, of Thomas Moody, by shooting him with a gun.

Eli Lowry pleaded guilty to the indictment, and was sentenced to imprisonment in the state-prison for life. The other defendants pleaded not guilty, and, on their motion, a change of venue was granted, to the county of Monroe.

In the Monroe Circuit Court the defendants elected to be tried separately, and the appellant was put upon his trial separately, before a jury, which resulted in his conviction and sentence to imprisonment for life in the state-prison.

Three errors are assigned, as follows:

1. The court erred in overruling the motion to quash the indictment ·

2.   The court erred in overruling the defendant's motion for a new trial; and,

3.   The court erred in overruling the defendant's motion in arrest of judgment.

In the brief of counsel for the appellant no reason is pointed out for the quashing of the indictment, or for the arrest of judgment, and we see none.   We therefore proceed to the consideration of the motion for a new trial.

It may be gathered from the evidence, that Alonzo B. Jones and Lee Jones were brothers, and sons-in-law of William Toliver, and that Milton P. Toliver and Thomas Toliver were brothers to each other, and sons of William Toliver.   It does not appear that Eli Lowry was related to either of the parties.   William Toliver, having become a widower, married Polly Moody, a sister of Thomas Moody, the deceased.   William Toliver having died after his marriage with Polly Moody, much ill feeling seems to have arisen, on the part of his sons and sons-in-law, against the Moody family, and especially against Thomas Moody, apparently growing out of the settlement of his estate.   At the time of the homicide Thomas Moody was living at the town of Orleans, and the Joneses and Tolivers were living at or near Mitchell, some five miles distant from Orleans.   On the evening of March 2d, 1875, Thomas Moody, as he was about entering his gate at his residence in Orleans, was shot with a gun and wounded by some one from the outside, from which wounds he died the next day.

The evidence in the cause is set out in a voluminous record, containing over fifteen hundred pages of manuscript, from which it appears, beyond a reasonable doubt, as we think, that the appellant, if he did not perpetrate the homicide with his own hand, counselled, aided and abetted in the perpetration thereof.

With this brief statement of the general features of the

case, we proceed to consider the grounds urged in the brief of counsel for the appellant for a reversal of the judgment. We may remark, however, before proceeding to consider these several grounds, that we can not reverse the judgment upon the evidence, which, as before intimated, makes out the case quite satisfactorily.

The other grounds may be conveniently divided into classes, as follows :

1.  Such as relate to the admission of evidence objected to by the defendant ;

2.  Such as relate to the exclusion of evidence offered by the defendant ; and,

3.  Such as relate to the charges given and those refused.

It was proved by William Moody, a brother of the deceased, that, on the night of the 24th of June, 1871, when the Moody family, consisting of the witness, Thomas Moody, now deceased, Polly Toliver, and one or two other members of the family, lived elsewhere than at Orleans, the house was broken into by persons from the outside, and sundry explosive and inflammable missiles were thrown into the house, which exploded therein, scattering their destructive contents, such as buckshot, nails and pieces of iron, about the house, injuring the inmates and doing much damage by burning and otherwise. In this raid Thomas Moody, now deceased, was severely injured by some of the missiles, or by a gun or pistol shot. The evidence was received on the statement of the prosecutor, that he would afterward give evidence connecting the defendant with the transaction, which was done. The family afterward moved to Orleans.

The witness was then asked by the counsel for the State the following questions:

" I will ask you, when you lived at Orleans, what condition you lived in, as to going out, or keeping your house barred up ? "

Objection by the defendant overruled, and exception.

The witness answered : "When we first went there we lived at McDonald's ; we rented a portion of that house, slept up stairs and fastened the doors up, and when we moved down where we live now we fastened all the doors, and generally stayed in after dark. The deceased generally " came in about dark, and " the witness did " not remember of any occasion when " the deceased " was out after dark, excepting the night he was shot, and on occasions when he was away on business, and was gone from home all night."

We can by no means say that the evidence thus objected to was inadmissible. Motive is generally an important element to be considered in cases of alleged murder, especially where the identity of the supposed murderer is controverted and required to be established.

The supposed motive of the appellant in making the raid upon the house of the Moodys in 1871, and in afterward taking the life of Thomas Moody, was his malice and ill-will engendered by the settlement of the affairs of the estate of William Toliver ; and it might be supposed that if such was the motive that prompted the murder, it would have been much sooner accomplished. But the careful and guarded manner in which Thomas Moody lived at Orleans may serve to explain why no safe opportunity was sooner presented for taking his life, and, therefore, why the murder, prompted by such motive, was not sooner perpetrated. In this aspect of the case, we think the evidence was competent, and we need not consider whether there was any other ground on which it was admissible.

The State proved by Zachariah Burton, that, after the death of Thomas Moody, the appellant spoke to the witness about a compromise with the Moodys. He wanted the witness to tell the Moody family, in substance, that he wanted them to pay him $5,000, and the widow Toliver to deed back the land she had got from the estate, and pay rent

from the time she had it; and if they did not do so he would make it cost them $10,000. If they did, they might move back uninterrupted by any one. The appellant asked the witness if he did not wish to live in a civil community, and the witness replying in the affirmative, the appellant said it would not be, and that the poisoning of Bob Hall's horses was nothing to what it would be. A similar statement was made by the appellant to Isam Hall, and proved by him. This evidence was objected to by the appellant, but we think it was properly admitted, as tending to show such malice and ill-will on the part of the appellant toward the Moodys, growing out of the affairs of the estate of William Toliver, as might have prompted the commission of the murder.

The State introduced Eli Lowry as a witness, who had pleaded guilty to the indictment and had been sent to the state-prison, and proved by him, among other things, that, before the day on which the deceased was killed, the appellant had threatened to kill him, and had tried to induce the witness to do so; that, on the morning of that day, the appellant told the witness he was going to kill Moody that night, and wanted the witness to go along. During the day Parks Toliver gave the witness some shot, and told him to take them to the appellant's mill, for Lee Jones. This the witness did, and found Lee Jones there. Lee Jones loaded some guns, and fired them at a target, to try them. During this time the appellant came there; and it was arranged that the witness and Lee Jones should go by themselves from Mitchell, and that the appellant and Parks Toliver and Thomas Toliver should go by themselves, and that the parties should all meet at a designated place a little less than a mile from Orleans, to go and kill Moody. Accordingly the parties all met at the designated place. It was then arranged that Lee Jones and Parks Toliver should go forward to Orleans and commit the deed, while

the appellant, Thomas Toliver and the witness remained
behind. Accordingly Lee Jones and Parks Toliver went
forward. When they had been gone some time, those who
remained behind heard two shots fired, in the direction of
Orleans, and soon thereafter Lee Jones and Parks Toliver
returned, reporting that they had accomplished the pur-
pose, Lee Jones having done the shooting. The parties
then hurried back to Mitchell.

The witness, in the course of his examination, spoke of
his having been down town after the arrangement above
mentioned had been made, and was asked by the State
who of the parties he saw down town, to which he replied
that he thought he saw Tom Toliver. The State then
proved by the witness, that, at the time, Thomas Tol-
iver asked the witness whether he was going to go
with them to do the work, that the witness replied that he
did not know whether he was or not, and that Toliver told
him to "get ready."

This conversation between the witness and Thomas Tol-
iver is objected to by counsel for the appellant, because the
appellant was not present. We think, however, that the
evidence of it was properly admitted. The conversation
evidently had reference to the common design and purpose.
The statements of Thomas Toliver were, according to the
evidence, the statements of a co-conspirator in reference
to the subject of the conspiracy, and in furtherance of its
objects.

Though he does not appear to have been present when
the arrangement was made, testified to by Lowry, to go to
Orleans that night and kill Moody, yet the fact that he did
go on that occasion, if such be the fact, as testified to by
Lowry, shows sufficiently that he was one of the conspira-
tors, and this made his statements in furtherance of the
common purpose competent evidence against his co-con-
spirators. 1 Greenleaf Ev., sec. 111; *Williams* v. *The State*,
47 Ind. 568.

On the examination of Lowry, something was said about his having been brought back to Mitchell, after having gone away, on a charge of the larceny of some money from Jefferson Jones. This seems to have occurred after the death of Moody, but before any one was arrested on the charge of his murder. The State proved, in answer to questions put to the witness, that, after he was brought back, the appellant told him. that he, the appellant, had had him brought back as a friend, and that, if the party losing the money intended to prosecute him, he would do so by the Saturday following, and that the witness should stay there during that time; that he did stay there until Saturday night, when he left for Illinois, the appellant letting him have money for that purpose.

The appellant objects that this evidence was totally irrelevant. We do not think it was so clearly so as to justify a reversal for its admission.

It might serve to illustrate the feelings and relations between the appellant and the witness. The appellant might have desired to befriend the witness, as an act of kindness and generosity, or he might, for other reasons, having relation to the murder of Moody, have desired to keep on good terms and not break with the witness. We think the evidence was competent to go for what the jury might regard it to be worth.

Mrs. Alice Patterson testified as a witness in the cause, on behalf of the State. It appeared in the evidence, that she and her husband lived at Mitchell, at the time of the murder, and that Eli Lowry boarded with them at that time. On the preliminary examination of the cause before a justice of the peace she had testified, that Eli Lowry was at their house, on the evening of the murder, took supper there, and stayed all night. This was contrary to her evidence delivered on the trial below. It also appeared by

the evidence of Lowry, that the appellant directed him to go to the Pattersons and get them to swear that he, Lowry, ate supper there that night, and was there during the evening. Mrs. Patterson, in answer to questions put by the State, testified, that Eli Lowry told her the next morning after the murder, that may be they would indict the appellant or arrest him right away, and he was a good friend of the appellant's, and if we (the Pattersons) were asked if he, Lowry, was there at our house for supper, to say he was there, to testify to that. Patterson asked how that was if he was innocent, and he said they would get him into trouble. He said he came in that night. He said, if we would not testify to this, the consequence would be that we would not be safe to step out in the yard after dark; the house would be blown up and all of us in it; he said that time and again. He said he himself was afraid of Jones.

The last statement, as to Lowry himself being afraid of Jones, we understand the court to have ruled out as incompetent.

It is insisted that the statements thus made by Lowry to the Pattersons were not competent.

But we are of opinion that they were clearly competent, as tending to explain the discrepancy between her present evidence and that delivered by her on the examination before the justice.

The statements of Lowry, if made, were in the nature of facts tending to show that Mrs. Patterson's evidence before the justice was given under the influence of fear and intimidation; and, if the jury believed such to have been the case, they probably would not think the discrepancy should detract, so much as would otherwise have been the case, from the credit that should attach to her evidence.

Columbus Moore was examined as a witness by the State, and he testified, that, after the death of William Toliver,

and after some lawsuits had arisen in reference to his estate, on the occasion of a lawsuit at Bedford, Thomas Moody was up stairs, at the Hughes Hotel, at Bedford. The appellant and Parks Toliver were at the house, down stairs in the bar-room. The bar-room opened into a hall which contained a stairway leading up stairs. Parks Toliver opened the door leading into the hall, having a pistol in his right hand, and, looking up the stairs, asked the witness if Thomas Moody' was up stairs, and being told that he was, asked what he was doing, and was told that he was playing cards. He said he was d—d tired of waiting. Some one then came down the stairs and went out. No further particulars are stated as to what was said or done by the appellant or Toliver. The bar-room was a small room, and Toliver appeared to be slightly intoxicated.

It is objected that this evidence was incompetent, but we are of a different opinion. The facts detailed might be regarded as having a tendency to show a purpose on the part of Parks Toliver to shoot Moody. If what was said and done by him was said and done in the presence and hearing of the appellant, it was competent to go in evidence, and it was for the jury to judge, from all the circumstances, how far the appellant concurred in, or dissented from, the supposed purpose. The bar-room was small, and it was for the jury to judge whether the appellant heard and saw what was said and done. But, aside from this view, there was evidence tending to show a conspiracy, as we have already seen, between the appellant, Parks Toliver and others, to kill Moody; and Greenleaf says: " It makes no difference at what time any one entered into the conspiracy. Every one who does enter into a common purpose or design is generally deemed, in law, a party to every act which had before been done by the others and a party to every act which may afterwards be done by any of the others in furtherance of such common design." 1 Greenl. Ev., sec. 111.

Alice Patterson, it seems, was indicted for perjury. She testified, that, in a conversation between herself and the appellant, he told her she was going to be indicted. She told him she had a great mind to go up and plead guilty, and tell the truth about it. He said it would do her no good if she did. He said he had a revolver in his boot for all those who went back on him.

William F. Clark was afterward called by the State, and the State proved by him that when the appellant was arrested he had two revolvers in his boot leg. The evidence of Clark is objected to, but we think it was competent.

Though the time of the arrest and that of the conversation are not precisely shown, the evidence tended, as we think, to corroborate and sustain the evidence of Mrs. Patterson.

The State was allowed to give in evidence the transcript of the record in the cause sent from Orange county. This is complained of as erroneous. We see no good purpose that was subserved by giving this transcript in evidence. It was an unnecessary but harmless piece of evidence.

This disposes of the points made on the evidence given.

We come now to that offered by the defendant and rejected.

The defendant, at the proper time, offered to prove by other witnesses, that one Jefferson Huffstetter had, at various times prior to the death of the deceased, threatened to kill him ; and, after his decease, admitted that he did kill him ; that he had hired Eli Lowry to kill him ; that he did not himself kill him, but that his money did, and that, on the night of his death, he had slept with his boots on.

These threats and admissions of Huffstetter were rejected, and we think correctly. If Huffstetter had been on trial for the murder, his threats and admissions would

have been competent evidence against him; but we do not see how they could be competent in favor of any other party. They were statements not made under oath. Doubtless, any act of Huffstetter might have been proved that would have had a tendency to show that he, and not the appellant, was guilty of the murder, and any thing he said, while doing the act, illustrating its purpose and character, being a part of the *res gestæ*, might have been proved. But such was not the case here. See, as to the inadmissibility of the evidence, the case of *The State* v. *Duncan*, 6 Ired. 236, and case there cited.

The defendant offered to prove, that, upon the trial of a cause in the Masonic Lodge, before the Masonic body, at Mitchell, in which Huffstetter had preferred charges against the appellant of striking and kicking him, the appellant, making his defence, said, in the presence of Huffstetter, amongst other things, that Huffstetter had accused him of the killing of Thomas Moody, when he, Huffstetter, knew that he himself was the murderer of Thomas Moody; when he knew that the appellant knew, and others knew, that he, Huffstetter, was the murderer of Thomas Moody; that Huffstetter hung his head, and, after the appellant finished his speech, made no denial, in any way, of the charge thus made against him.

This evidence was rightly rejected. We see nothing in it that could legitimately have tended to prove either that Huffstetter was, or that the appellant was not, guilty of the murder.

The defendant introduced as a witness one Thomas D. Lindsey, and, having examined him generally in the case, put to him the following question:

"Has there been any effort made by Robert Teagarden, Charles Keith and Ed. Millis and Ward, to prevent you from testifying in this case?"

On objection being made by the State, the counsel for the

defendant stated " that he desired to show the means and appliances used by those managing the prosecution, to show the influences brought to bear on witnesses."

The objection was sustained, and, as we think, properly. It will be observed, that the question was not asked with a view to the impeachment of any of the persons named; no foundation had been laid for that. It will also be observed, that there was no offer to prove any thing definite. What the " means and appliances " and " influences " were, was not stated. But, assuming that the persons named in the question had been actively instrumental in aiding the prosecution, and that they had made efforts to prevent the witness from testifying, we do not see how that fact could have had the slightest influence in determining the guilt or innocence of the appellant. The persons named might, doubtless, when examined by the State, have been asked, on cross-examination by the defendant, with a view to test their credibility, whether they had made such effort, and, if they had denied it, they might have been contradicted by proof of the fact.

This disposes of all the questions arising upon the admission or rejection of evidence.

We pass to the instructions.

The appellant's counsel prepared twenty-six charges, and asked that they be given to the jury, but the court refused them all, and gave thirty-eight of its own motion. We may remark, that the charges given were more than usually full and explicit, and placed the law of the case fully and fairly before the jury. Some objections to portions of them will be hereinafter more fully considered. The chief question arising on the charges is, whether those given by the court embraced the substance of all those asked by the appellant, which should have been given in the absence of those given by the court. The charges asked and refused,

and those given, are too long to be here set out in full, and we shall refer to such portions of them only as may be necessary to an understanding of the questions involved.

The first and second charges asked contained a general outline of the case as shown by some of the evidence, and stated a theory of the case, but did not contain any statement of law whatever. There was no error in refusing these charges, because they had reference to matters of fact and not of law.

The third charge asked was as follows:

"There is no other theory of the killing having been done by the defendant, or participated in by him, upon which any evidence has been offered, or as tending to establish which any evidence has been offered by the State, than the above mentioned. The court therefore instructs the jury, that if, upon all the evidence in the case, the jury entertain a reasonable doubt of the truth of this theory, that is, entertain a reasonable doubt that the defendant, in the manner set forth in Lowry's evidence, killed, or participated in the killing of, the deceased, Thomas Moody, then they should acquit the defendant; for the State can not assume a theory as to the manner and circumstances of the killing, and, upon finding that that manner and method of killing has not been established to the satisfaction of the jury, ask the jury to supply the defect in such proof by surmise or mere conjecture."

We think there was no error committed in refusing this charge, because we can not say that there was no evidence tending to show that the appellant participated in the murder of Moody, though it may not have been committed " in the manner set forth in Lowry's evidence." There was, on the contrary, some evidence tending to show that he participated in that murder, or counselled, aided and abetted therein, though it may not have been done as stated by Lowry.

The counsel for the appellant claims, as we understand his brief, that the State, having tried the case on the theory that the murder was perpetrated in the manner stated by Lowry,. could not claim a conviction on any other theory. We see no reason for this proposition. The State might go through the trial on a particular theory, and, if the evidence developed facts tending to show the defendant's guilt on any other theory, the question of the defendant's guilt on the other theory would be a matter proper for the consideration. of the jury.

We here copy the following charge given by the court, because it states the views of the court below upon the point we have been considering, and also because it is claimed to have been erroneous in another respect:

" And so, also, I have indicated, and now charge you, that if this evidence, or any evidence in the case, causes you to entertain a reasonable doubt of defendant's guilt, you should acquit. But, in considering the question of *alibi*, it is important that you look into all the testimony in the case, and determine whether it is necessary, in order to establish the guilt of defendant, that the State should convince you beyond a reasonable doubt, that the defendant and those indicted with him, should have left Mitchell in the evening of said 2d day of March, 1875, or at all that day, and should have participated in said homicide, by the performance of the several and identical parts assigned them by the testimony of the witness Eli Lowry, and that Lowry himself should have participated in said homicide in the manner and form he himself asserts, or should have been at the several places on that day and at the several times he asserts; and in this connection I instruct you, that, if you are convinced beyond a reasonable doubt, from the whole testimony in the case, that, at the time and place mentioned in the indictment, the said Thomas Moody was unlawfully slain·by the hand of some

one, and that the defendant was a guilty participant in said homicide, by having feloniously counselled, encouraged, hired, or otherwise procured such person to so unlawfully kill Moody, you should find him guilty of said homicide, although you may also find that the *alibi* asserted by him, both as it regards himself and his confederates, and also the witness Lowry, may be true. For you should bear in mind, that the principal and real issue you are to determine is the question of defendant's guilt or innocence of the alleged murder of Thomas Moody and although you should find, that the State has failed to prove against him particular acts of participation charged against him by said Lowry, but find that she has, nevertheless, proved, beyond a reasonable doubt, his guilt of said murder, you should so find him guilty."

It is objected that the part of the charge which informed the jury that they might find the defendant guilty, in case they were satisfied by the evidence, beyond a reasonable doubt, of his guilt, though they might find that the *alibi* asserted by him, both as regards himself and his confederates, and also the witness Lowry, may be true, is erroneous.

We think the word " confederates," as used in the charge, was used in the sense of " those indicted with him," words used in the former part of the charge, and that it must have been so understood by the jury. With this meaning attached to the word, the charge, in our opinion, was correct. The appellant may have been guilty of counselling, aiding or abetting in the commission of the murder, and yet neither he nor those indicted with him may have been at the place of the murder at the time thereof, but elsewhere.

Again, the appellant and his confederates may have been elsewhere when the murder was committed, and yet the appellant may have been guilty of having procured its

commission by the hand of some one not having joined the confederacy, and who could not properly be called a confederate, but a mere instrument.  Either view will uphold the charge; for we have a statute which provides, that "Any person who counsels, aids, or abets in the commission of · any offence, may be charged, tried and convicted in the same manner as if he were a principal." 2 R. S. 1876, p. 388, sec. 66.

The 4th, 5th and 6th charges asked related to the credibility which should attach to the testimony of the witness Lowry, he being a convict under life sentence for murder. We think the law on that subject was correctly and sufficiently stated in the charges given by the court. The court did not, it is true, state to the jury, as was asked, that in times past such convict was incompetent to testify at all; but this was unnecessary.  It was sufficient that the jury were given to understand that his infamy as such convict went to his credibility, without stating what the law had been in former times.  The then present, and not the past, state of the law was what governed.

The 7th, 8th and 9th related to the testimony of Lowry as an accomplice, and we think their substance was embraced in the charges given.

The 13th related to the credibility of witnesses who have committed perjury on a former occasion, and was substantially embraced in the charges given.

The 14th was as follows, and was correctly refused:

" When a witness pretends that he or she has sworn to a different state of facts from that to which he or she now swears, because of fear of some person, the jury are not bound to, or justified in accepting the statement that such witness was operated upon by such pretended fear.  But the jury should look behind that statement at all the facts, and if they find that there were no facts existing sufficient to inspire such fear, they may, and if they can find

no other reason for such conduct, they ought to, reject the evidence of such witness entirely."

The charge was an invasion of the province of the jury, who had the exclusive right to determine what credit should be attached to the testimony of the witnesses. The idea is embodied in the charge, that, if there were no facts sufficient, in the opinion of the jury, to inspire the fear, and if they could find no other reason for the conduct of the witness, his evidence ought to be rejected entirely.

This cannot be laid down as a rule of law. · What might seem to the jury as not sufficient to inspire fear might, in point of fact, have inspired fear on the part of the witness. Indeed, fear is inspired on many occasions and in various situations in life when there does not appear to be any sufficient cause for it. Much must depend upon the temper-ament and mental constitution of the person whose fears are supposed to be wrought upon. What might inspire terror in one might excite no apprehension in another. Such questions should be left to the untrammelled determination of the jury, who seldom fail to pass upon them intelligently.

In the brief of counsel for the appellant, it is said of instructions 15 to 19 inclusive, that " these instructions, in substance, ask the court to charge the jury, in view of the theory of the prosecution, that the presence of the defendant in Mitchell, on the night of the alleged murder, or the presence of the witness Lowry at Orleans, on the afternoon of the 2d of March, 1875, would, both or either, be fatal to the cause of the State," etc.

What has been already said shows that these instructions were properly refused.

Instructions asked, numbered 20, 21 and 22, relate to the subject of threats and admissions, upon which, it seems to us, the court fully charged.

No point is made upon the refusal of the court to give any of the other instructions asked ; nor is any further objection made to those given, except the following:

" As to murder in the first degree, the statute submits to your discretion a choice between two modes of punishment. The Legislature has made it a part of the law of the State that you shall have the right to prescribe the penalty of death for such offence. Just how far such legislation has changed or modified, or to what extent it is in accordance with, the eternal laws of the Author of Life, you must determine on your own responsibilities to Him. I do not attempt to determine this for you, and, on the other hand, would not be understood by this charge as giving any personal sanction to this feature which our law-makers have borrowed from the barbarisms of the past. The other form of punishment prescribed by the statute is that of imprisonment for life in the state-prison. The punishment for murder in the second degree is imprisonment in the state-prison for life. The punishment for manslaughter is imprisonment in the state-prison for not more than twenty-one, nor less than two, years."

It is urged by counsel for the appellant, that this charge was wrong, as being calculated to impress on the minds of the jury a conviction that the judge thought him guilty. We do not think the charge open to the objection. The jury might well have concluded from the charge, that the judge was opposed to capital punishment; and it is by no means certain that the charge did not have some influence on the minds of the jury in fixing the lighter punishment; but of this the appellant can not complain.

We have thus considered the questions involved, and find no error in the record.

The judgment below is affirmed, with costs.