No. 11,936.

## KOERNER v. THE STATE.

| 98 | 7 |
| 134 | 272 |
| 135 | 259 |
| 136 | 633 |
| 98 | 7 |
| 142 | 295 |
| 98 | 7 |
| 147 | 382 |
| 98 | 7 |
| 157 | 215 |
| 98 | 7 |
| 161 | 355 |

CRIMINAL LAW.—*Murder in First Degree.*—*Malice.*—That there may be such premeditated malice as will make a homicide murder in the first degree, there must be time and opportunity for deliberate thought; the thought of taking life must be conceived in the mind; the conception must be meditated upon, and a deliberate determination formed to do the act. When the determination is thus formed, it makes no difference how soon thereafter it is carried into execution.

SAME.—*Instruction upon Facts not in Dispute.*—Where the existence of a fact is established without any conflict, contradiction or dispute, the court may instruct that there is evidence tending to prove such fact.

SAME.—*Circumstantial Evidence.*—An instruction should be considered as a whole, and not in fragments. In charging as to the rules to govern in considering circumstantial evidence, the court may direct the attention of the jury to the circumstances relied upon by the State, if at the same time it is left to the jury to determine whether or not the circumstances are shown to exist.

SAME.—*Admissions.*—It is not improper to instruct the jury that if they find that the accused made statements or admissions, they may give to such statements or admissions great, little, or no weight.

SAME.—It is not error to refuse instructions, when the substance of them is covered by instructions given by the court.

SAME.—The court is not required to instruct upon each separate item of evidence, nor to direct the jury to determine between the different *theories* of the State and the accused.

SAME.—*Malice.*—For the purpose of showing premeditated malice, evidence of frequent quarrels between the deceased and the accused, for a number of years, and up to the time of the homicide, is competent.

From the Criminal Court of Marion County.

*S. Claypool, W. A. Ketcham* and *B. F. Watts,* for appellant.

*F. T. Hord,* Attorney General, and *W. T. Brown,* Prosecuting Attorney, for the State.

ZOLLARS, J.—Appellant was convicted, and sentenced to suffer death, upon a charge of having murdered his wife. The contention here is that the evidence fails to show appellant to have been guilty, and especially of murder in the first degree, and that the trial court erred in the instructions given, and in refusing those asked by appellant. In the first three

instructions the court defined the nature of the charge against appellant, defined murder in the first and second degree, and manslaughter, and instructed the jury that the burden was upon the State to prove beyond a reasonable doubt every allegation in the indictment; that appellant was presumed to be innocent until proven guilty beyond all reasonable doubt; that this presumption of innocence attended him step by step through the entire case; that a person charged with murder in the first degree may, if warranted by the evidence, be convicted of murder in the second degree, or of manslaughter; that where there is a reasonable doubt as to whether a party thus charged is guilty of the higher or lesser offence, the conviction, if any, must be of the lesser offence.

Following these charges, the court gave the fourth instruction, which appellant contends is erroneous. After having charged the jury in this instruction upon the question of premeditated malice, murder in the first degree, and reasonable doubt, the court added:

"In this degree of felonious homicide, there must be the elements of purpose, malice and premeditation. If either of these elements be absent, there can be no conviction of this grade of felonious homicide. A premeditated design or purpose is one resulting from thought and reflection; a design conceived, and afterwards so deliberately considered as to become resolved and fixed, is regarded by the law, as premeditated. When the design to take human life is formed after deliberation, and where there is adequate time and opportunity for deliberate thought, then, no matter how soon the felonious killing may follow the formation of the settled purpose, it is murder in the first degree. There need be no appreciable space of time between the formation of the intention to kill and the killing; they may be as instantaneous as successive thoughts. It is only necessary that the act of killing be preceded by the concurrence of will, deliberation and premeditation on the part of the slayer; but when there

is no time and opportunity for deliberate thought then the unlawful killing can not be murder in the first degree."

The objections urged against this instruction are, first, that so many and varying styles of expression are used, defining premeditated malice, as to render the instruction perplexing and misleading, and, second, that the statement that "there need be no appreciable space of time between the formation of the intention to kill and the killing; they may be as instantaneous as successive thoughts," when taken in connection with the evidence, was calculated to create an impression upon the minds of the jury that, notwithstanding the short space of time, if the killing was done by appellant, it might be murder in the first degree. These objections, we think, are not tenable. There is no such varying statements upon the subject of premeditation as could mislead any one. Indeed, the trial court seems to have been especially careful to impress upon the minds of the jury that in order to sustain the charge of murder in the first degree, it was necessary to show that there was time for deliberation, that there was such deliberation, and a fixed purpose to kill, *preceding* the killing. The instruction is within the rule laid down in the case of *Fahnestock* v. *State*, 23 Ind. 231, where it was said, in speaking of murder in the first degree: "In the former," (murder in the first degree,) "premeditated malice requires that there should be time and opportunity for deliberate thought; and that, after the mind conceives the thought of taking the life, the conception is meditated upon, and a deliberate determination formed to do the act; that being done, then no difference how soon afterward the fatal resolve is carried into execution, it is murder in the first degree." The instruction under examination is also clearly within the ruling in the case of *Binns* v. *State*, 66 Ind. 428, and is very much the same as the instruction passed upon in that case. In that case the court quoted with approbation from Wharton on Homicide, section 180, as follows: "There is a general concurrence of authority on the general meaning of premeditation. It involves a

prior intention to do the act in question. It is not necessary that this intention should have been conceived for any particular period of time. It is as much premeditation, if it be entered into the mind of the guilty agent a moment before the act, as if it entered ten years before."

As an abstract proposition of law, we regard the instruction as a correct enunciation, and we can not say that there was anything in the evidence which might render this correct enunciation of the law misleading to the jury or prejudicial to appellant. Whether or not there was premeditated malice, and whether or not, under all of the facts and circumstances of the case, there was sufficient time for such premeditation, were questions for the jury. The court had no right to assume that there was, or was not, sufficient time for such premeditation.

In considering the objections urged against the eighth instruction given by the court, it is proper to state some of the main facts of the case, which are, briefly, these: For quite a while preceding the homicide, appellant and his wife had had frequent disagreements and quarrels. On one or two occasions she had left home, with bruises upon her person, and remained at the houses of neighbors for more than a day at a time. On several occasions she had been seen fleeing from him, and he in pursuit. On several occasions he had struck, maltreated, and threatened to kill her; they had a disagreement on the day before her death. In the afternoon of that day she was found crying. On the evening of the same day, a short time before she retired, appellant used violent and profane language towards her. During the night the hired man, who slept in an adjoining room, heard some one walk across the floor of the room in which appellant and his wife slept, and heard some noise at their bed; he thought nothing of it, and again fell asleep. Appellant was a dairy-man. He was in the habit of rising early to milk his cows and get an early start to deliver milk to his customers. On the morning of the 22d of December, 1883, at about three o'clock, he called

the hired man, who at once got up and dressed, and found appellant dressed. They went to the 'barn to feed and milk the cows, leaving the house from the portion in which the hired man slept, and not passing through the room in which appellant and his wife slept. After having been engaged at their work at the barn for about one hour and a half, appellant returned to the house, leaving the hired man to finish the feeding and milking, which was nearly completed. After being at the house for some time, appellant, in an excited manner, called for the hired man to come to the house. The hired man testified that fifteen or twenty minutes elapsed from the time appellant left the barn until the calls. Appellant testified that the time was about five minutes. The hired man went to the house at once, and found appellant excited, and apparently in great trouble. He took the hired man to the bed, removed the covers from the face of his wife, and said that some one had shot and killed her; that she was warm yet. The bed in which the wife lay showed no signs of a struggle.

In making a statement to others, subsequent to this, appellant said that when he returned from the barn, he went first into the kitchen, expecting to find his wife preparing breakfast, and, not finding her there, went into the room where she slept, and found her dead.

She had not been shot, but was killed by a blow across the face and head with some hard instrument, not over one-half or three-quarters of an inch thick. No such weapon was found in the house except an iron stove poker. So far as shown by the evidence, no blood was found upon the poker. There is no evidence that any one examined it with that view. During the morning appellant frequently poked the fire with it. At the time of the conversation with the hired man above stated, appellant also said that his " pants " had been stolen ; that there was money in the pockets. After others had come to the house, appellant stated to them that his " pants " had been stolen. These " pants " were afterwards found upon a rain barrel, at the corner of the house. These were the pantaloons

he wore in delivering milk, and which he had taken off on the previous day, after having delivered milk to his customers.

From the corner of the house there were tracks which led across the lot and into an adjoining lot and road; and from this lot, in a somewhat circuitous way, were tracks which led back to the rain barrel, where the " pants " were found. Appellant had upon his feet a pair of shoes with wooden soles. These shoes were peculiar in their construction. The evidence shows that he had worn them during the morning while out. Several of the witnesses who were at the house in the early morning testified that they had fitted the shoes into the tracks in the snow, which led from and to the rain barrel, and that there was an exact correspondence between the tracks and the shoes.

The theory of the State is that appellant killed his wife, left the pantaloons upon the rain barrel, and made the tracks to turn suspicion from him. Appellant's contention is that these tracks were made by some one who entered the house for robbery, and while there killed his wife, took the pantaloons and left them upon the rain barrel. It was upon this branch of the case that the eighth instruction was given by the court, which is as follows: "There is evidence tending to prove that tracks were found in the snow the morning of the arrest of the accused in and about and upon the premises of the defendant. Whether or not these tracks were made by the defendant, is for you to determine. Whether these tracks led from the barrel to the road, or from the road to the barrel, or what direction they took, is your province to decide, yielding to the defendant the benefit of all reasonable doubt in considering this feature of the case. You will, in no event, consider this against him, unless you find he made them."

The objections urged to this instruction are that the court had no right to assume that there was evidence tending to show that there were such tracks, and that, by the concluding words, the court, in effect, said to the jury, that if they found that appellant made the tracks, that was inculpatory

evidence, to be considered against him. It must be remembered that there was no conflict in the evidence as to the existence of the tracks. Several witnesses testified that there were such tracks, and no one disputed that fact.

It is the settled law that where there is any conflict in the evidence as to the existence of any fact in the case, the court can not, in charging the jury, assume that such fact has, or has not been established. This would be an invasion of the province of the jury. This is the ruling in the case of *Finch* v. *Bergins*, 89 Ind. 360, cited by counsel for appellant. But where the existence of a fact (as in this case, the existence of the tracks,) is established by the evidence without any conflict, contradiction or dispute whatever, it is not an available error for the court to instruct the jury that there is evidence tending to prove such fact. See the following authorities: *Carver* v. *Carver*, 97 Ind. 497; *Hazzard* v. *Citizens State Bank*, 72 Ind. 130; *Moss* v. *Witness Printing Co.*, 64 Ind. 125; *Dodge* v. *Gaylord*, 53 Ind. 365; *American Ins. Co.* v. *Butler*, 70 Ind. 1; *Adams* v. *Kennedy*, 90 Ind. 318; *Steinmetz* v. *Wingate*, 42 Ind. 574; *Hynds* v. *Hays*, 25 Ind. 31; *Porter* v. *Millard*, 18 Ind. 502; *State Bank of Indiana* v. *Hayes*, 3 Ind. 400; *Crookshank* v. *Kellogg*, 8 Blackf. 256; *Nixon* v. *Brown*, 4 Blackf. 157; *Governor, etc.*, v. *Shelby*, 2 Blackf. 26; *Hughes* v. *Monty*, 24 Iowa, 499; *Miller* v. *Kirby*, 74 Ill. 242; *Heartt* v. *Rhodes*, 66 Ill. 351; *Hanrahan* v. *People*, 91 Ill. 142.

Mr. Thompson, in his work on Charging the Jury, at page 74, says: " But whilst it is improper for the judge to assume the existence of a fact in issue, yet, where the evidence is clear and conclusive as to the existence of the particular fact, and there is no evidence to the contrary, an instruction, assuming it as true, will not work a reversal of the judgment." This is a very good summary of the doctrine of the cases above cited. Tested by the doctrine of these cases, the objection urged to the instruction under consideration, that it improperly assumes the existence of facts, is not well taken.

Koerner v. The State.

The important thing to appellant was not the existence of the tracks, but whether or not he made them.   That question was submitted to the jury with the proper safeguards.

It can not be justly said that the concluding portion of the instruction amounted to a charge that if the jury found that appellant made the tracks, that was inculpatory evidence against him.   The court did not say what weight such evidence should have, or that it should have any.   Nor do we think that any intimation of the kind was given.   The caution was given that in no event should the existence of the tracks be considered against appellant, unless it should be found that he made them.   It may be granted that from this an inference might be drawn that if the jury should find that appellant made the tracks, that fact would be a proper matter for consideration, but that it would be inculpatory evidence against him, can not be inferred from the instruction.

The ninth instruction given by the court is as follows: "Where a conviction for a criminal offence is sought upon circumstantial evidence, the State must show, beyond a reasonable doubt, that the alleged facts and circumstances are true, and that such facts and circumstances are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused, and incapable of explanation upon any rational conclusion or reasonable hypothesis other than that of the guilt of the accused.   And in this case, if all the facts and circumstances relied on by the State to secure a conviction, can be reasonably accounted for upon any theory which is consistent with the innocence of the defendant, then you should find for him; and the facts and circumstances relied upon by the State, and proved under the rules of law, as hereinbefore indicated, should be such as to leave no reasonable doubt in the minds of the jury as to the defendant's guilt.   So you will be governed by these rules in determining what weight, if any, you will give to the testimony touching footprints and tracks, their course and direction, the finding of a pair of pantaloons upon a rain barrel, if any were

found, the vest, and the money mentioned by the witnesses left undisturbed in the defendant's house, if such was the case, and all the other facts and circumstances in the case."

Three objections are urged to this instruction : The sum of the first is that the first portion of the instruction does not go far enough ; that the court should have charged that the facts and circumstances, in order to justify a conviction, should not be susceptible of any reasonable explanation consistent with the defendant's innocence, point to the defendant's guilt beyond a reasonable solution, and satisfy the jury of his guilt beyond a reasonable doubt. All this, we think, is embraced in the instruction. It is there stated that the State must show that the facts and circumstances are absolutely incompatible with any hypothesis of the appellant's innocence, and incapable of explanation upon any hypothesis except that of his guilt; and that they must be such as to leave no reasonable doubt in the minds of the jury as to his guilt. ·

The second objection is that the instruction directs that if *all* the facts and circumstances could not be accounted for on the hypothesis of the defendant's innocence, the jury should find him not guilty, thus leaving it to be inferred that if *all* the facts and circumstances could *not* be thus accounted for, then they should find him guilty. An instruction should be considered as a whole, and not cut up into fragments, and each fragment thus dissected. It would be difficult, indeed, to so construct an instruction that plausible objections might not be urged to detached parts. Immediately following the portion complained of is the broad statement that the facts and circumstances relied upon by the State, and proven, as before indicated, that is, beyond a reasonable doubt, should be such as to leave no reasonable doubt in the minds of the jury as to the defendant's guilt. Whether one fact or circumstance, or many or all, they or it under this instruction must be such as to leave no reasonable doubt in the minds of the jury as to the defendant's guilt. If the jury should

be thus satisfied, it would seem to be of little consequence whether the facts and circumstances, by which such a conviction upon their minds should be produced, were few or many, so they were sufficient. We think, that taken as a whole, the instruction is not open to the objection thus far noticed.

The third and last objection argued by counsel is, that in the concluding portion of the instruction a reference is made, and undue prominence given, to certain parts of the evidence.

In considering this objection it is proper to advert to some of the evidence not yet noticed. It was in evidence that after the arrival of the officers and others, on the morning of the homicide, appellant first said that he thought his brother had killed his wife because of religious differences between them. After saying this a Mr. Kelly said to him: "Well now, Mr. Koerner, it is a shame for you to accuse your brother of killing your wife, when you know you did it yourself." To which he responded: "I not know what I do." Another witness states that he said he did not know what he was doing. At no time did appellant say that he killed his wife. On the other hand, he stoutly denied it many times. Subsequent to this he said a tramp might have killed her; that he had a pair of pantaloons hanging on a nail on the wall with some money in them, nickels, dimes and quarters, which he had gathered from his milk customers; that when he came into the house from the barn he found that the pantaloons were gone, and that a tramp might have killed his wife to take the pantaloons and money. There was a vest hanging very near, or on the same nail where the pantaloons had hung. Mr. Kelly took the vest down, and found in the pockets small change such as appellant had said had been in the pockets of the pantaloons, and then said to appellant: "Mr. Koerner, a tramp would not have done that; he would have gone off with the vest too." Appellant then said: "May be it was my hired hand. Me and him had some trouble about a coat. I found the coat in his trunk, and he left, and said when he quit, I will get even with you, and

may be he came back and killed my wife to get even." The hired hand here referred to is not the one who was then working for appellant. Previous to this conversation, or about that time, appellant had been put under arrest. When the hour of the morning arrived at which he had been accustomed to deliver his milk, viz., about six o'clock, he wanted to go and deliver it, and save his customers. Some of the witnesses who were present and witnessed appellant's manifestations of grief testified that they were feigned. It was established by the evidence, without any opposing testimony, that on a shelf near the bed in which the wife lay there were eight dollars in silver which were undisturbed. Other money in the house was also left undisturbed, some forty-three dollars in all.

As will be noticed, the court in the foregoing instruction, after charging the jury that the facts and circumstances relied upon by the State should be such as to leave no reasonable doubt in the minds of the jury as to the defendant's guilt, called their attention to the testimony as to the footprints and tracks, the course and direction thereof, the finding of the pantaloons upon the rain barrel, the vest, the money left in the house undisturbed, " and all other facts and circumstances." It will be observed that the court did not assume the existence of any of these facts, but explicitly left it to the jury to determine from the evidence as to whether or not they had been established by the evidence under the rule theretofore announced, which was certainly very favorable to the defendant, viz., that each fact and circumstance must be proven beyond a reasonable doubt; and, also, explicitly left it to the jury to say what weight, if any, should be given to the several facts and circumstances, if established by the evidence. The only complaint that could, with any plausibility, be made of this portion of the instruction, is that made by appellant, and that is, that the court should not in any way have called attention to the facts and circumstances relied on by the State. If this objection is well taken here, it will necessitate a rul-

ing, which should not be made, that in no case can the trial
court call the attention of the jury to the facts and circum-
stances in evidence, and instruct as to the rule to be acted on
by the jury in determining as to whether or not they have been
established by the evidence. There is nothing in the instruc-
tion to indicate, in the least, that the court was inclined against
the defendant, or that the facts and circumstances were re-
garded by the court as of much, or little, or of any weight—
all that was left to the jury; nor is there anything to limit
the investigation of the jury to the facts and circumstances
to which their attention was thus called to the exclusion of
the other facts and circumstances in evidence; on the con-
trary, the jury were charged that the rule theretofore given
should be applied by them in determining these facts, and all
other facts and circumstances in evidence. The instruction
is altogether dissimilar to that passed upon in the case of
*Barker* v. *State*, 48 Ind. 163, cited by counsel for appellant,
and hence that case is not authority in support of appellant's
position here. In connection with that case see the cases of
*McCorkle* v. *Simpson*, 42 Ind. 453; *Sawyer* v. *State*, 35 Ind.
80; *Shank* v. *State, ex rel.*, 25 Ind 207.

It is proper to observe, in passing, that in the ninth and
seventeenth instructions requested by appellant, the court
was asked to call the attention of the jury to these facts, very
much as was done by the court in the instruction under ex-
amination.

The eleventh instruction given by the court was and is ob-
jected to. It is as follows: " Verbal admissions, consisting
of mere repetitions of oral statements by the defendant, made
several months ago, may be subject to much imperfection and
mistake, for the reason that the defendant may not have ex-
pressed his meaning, or that the witness may have misunder-
stood him, or by not giving his exact language, and in the
connection used, may have changed the meaning of what was
said; but you are the exclusive judges of the weight to be
given to such evidence in this cause. But if you find that

the defendant did make any admissions or statements at any time, you will consider these things, together with his knowledge of the English language, and his power to express himself clearly, and his intelligence. If the admissions were freely, voluntarily, without fear, hope of reward, understandingly and deliberately made, and clearly proved, the jury may, in their discretion, and are at liberty to give them great weight in their deliberations."

The first portion of this instruction, in some respects, is very favorable to appellant. With that portion he finds no fault. His contention is that the court did not distinguish between mere statements, declarations and admissions, and erroneously charged the jury that they might give great weight to mere statements of the defendant; that the court had no right to thus place stress upon admissions or declarations. In support of this contention we are cited to the case of *Finch* v. *Bergins*, 89 Ind. 360. In that case the jury were instructed positively, as a matter of law, that verbal admissions ought to be received with great caution ; that such evidence is subject to much imperfection and mistake, etc. Various elements of weakness were thus pointed out and declared to be such as a matter of law. After thus calling attention to the infirmities of such evidence, the instruction closed as follows : " If you believe that the admissions were deliberately made and precisely identified, the evidence afforded thereby is often of the most satisfactory nature."

In discussing this instruction, and the objections urged to it, the court cited with approbation the case of *Davis* v. *Hardy*, 76 Ind. 272, where it was held that such an instruction is an invasion of the jury's right to judge of the credibility and weight of evidence, and quoted from that case the following : " It is proper matter of argument that such evidence is subject to imperfection and discredit, for the reasons suggested, and the court may direct the jury's attention to the subject. But it is not for the court to say, as matter of law, in reference to the evidence of this kind, given in a particular case,

that it is subject to much imperfection; or that 'it frequently happens that the witness, by unintentionally altering a few expressions really used, gives an effect to the statement completely at variance with what the party did say;' or that, 'where the admission is deliberately made and precisely identified, the evidence is often of the most satisfactory nature.' These are matters of fact, experience and argument, but not otherwise the subject of legal cognizance." To the same effect is the case of *Garfield* v. *State*, 74 Ind. 60.

The substance and import of the instructions under examination, taken as a whole, are, that the jury should determine as to whether or not any statements or admissions were made by appellant; that if they should find that he did make any statements or admissions, they should be considered in connection with his intelligence, his knowledge of the English language, his power to express himself, the time that had elapsed, the facts that he may not have expressed his meaning, that witnesses may have misunderstood him, or by not giving his exact language, and in the connection used, may have changed the meaning of what was said; that on account of these several considerations, the evidence of such statements or admissions may be subject to much imperfection and mistake; that the jury were the exclusive judges of the weight to be given to the evidence, and might, if they thought proper, give great, little or no weight to the statements and admissions, if they should find that they were freely, voluntarily, without fear, hope of reward, understandingly and deliberately made.

This instruction is not subject to the vices for which the instructions in the cases last above cited were condemned.

There the court instructed, as a matter of law, that the evidence of admissions is subject to much imperfection and mistake. Here it was charged that it *may* be subject to such imperfection and mistake. There it was charged that the evidence afforded by admissions deliberately made, etc., is

often of the most satisfactory nature. Here the charge is, that if there were statements and admissions deliberately made, the jury might, in their discretion, give to them great weight. There the weight of the evidence was declared as a matter of law. Here the jury were instructed that they were the exclusive judges of the weight of the evidence. It can not be justly said that the court placed great stress upon admissions or declarations. Taking the instruction as a whole, it amounted to a charge that the jury might give to the evidence upon that subject great or little or no weight at all. Nor did the court assume that there were any admissions, declarations or statements. As to what was said by appellant, and as to whether it amounted to an admission, declaration or statement, were properly left to the jury to determine.

We turn now to the instructions requested by appellant and refused. Our attention is called to a large number, with the simply statement that they should have been given. As to the most of them there is no further statement or argument in the brief of counsel. As to some of them, however, the questions were discussed orally. We have, however, carefully examined all of them. We find that the fourth, thus asked, in relation to circumstantial evidence, is fully covered by the ninth, given by the court, already set out, where the rule is stated as favorably to appellant, as he had a right to ask, and much stronger in his favor than is sanctioned by some of the cases. See *Wade* v. *State,* 71 Ind. 535.

The substance of the fifth instruction refused is, that in all cases of doubt upon questions of credibility, conflict between witnesses, or as to what circumstances establish, or tend to establish, the conflict or doubt should be solved in favor of the defendant. The substance of the sixth so refused is, that if there was a conflict between the State and the defendant as to the hour or period of time at which the killing was done, and that time became, in the judgment of the jury, material, the jury should solve the conflict on the side of the

defendant, unless satisfied beyond a reasonable doubt that the position of the State was correct. The substance of the seventh charge refused is, that if there was any conflict between the State and the defendant as to whether the body of the deceased was, at or near a particular hour, cold or warm, that conflict should be solved on the side of the defendant. These last two instructions were intended to apply to the evidence as to the condition of the body of the deceased, whether cold or warm, at the time the hired man came into the house, and at the time of the arrival of other witnesses. It is not apparent from the record what the theory of the State was, except the theory that appellant murdered his wife. The theory of appellant seems to be and to have been as indicated by his statements and testimony, and the argument of his counsel, that some one entered and killed her soon after appellant left the house, and while he was at the barn. No very thorough examination seems to have been made to ascertain as to whether the body was cold or warm. Some of the witnesses testified that it was warm, and others that it was cold, as indicated by the nose and feet. The argument on the part of appellant is, that the body was cold, and that this indicated, and, in fact, was sufficient to show, that appellant could not have killed her after he returned from the barn. What weight the evidence upon this point should have was for the jury under proper instructions. See *Jones* v. *State*, 64 Ind. 473.

These instructions are not thus limited; they would require the jury to decide what the theories of the State and appellant were; that there was a conflict between these theories; and to determine that conflict in favor of one or the other party. In this respect the instruction would be much more likely to mislead than to enlighten the jury. And besides, when the court has put the whole case to the jury by proper and full instructions, as was done in this case, it would be a very tedious and unreasonable practice to require a separate instruction upon each separate item of evi-

dence. *Wade* v. *State, supra.* So far as any of these instructions contain a correct statement of the law, they were fully covered by the instructions given by the court, and especially by the fourteenth, which is as follows: "If there is a reasonable doubt in your minds, arising from any fact or circumstance adduced in evidence, or from the absence or want of evidence of any fact or circumstance, or upon the conflict of testimony, or any other material matter in the case, you will resolve that-doubt in favor of the defendant."

In connection with this, it may be well to refer again to the ninth instruction given by the court, in which it was charged that where a conviction is asked upon circumstantial evidence, the State must show, beyond a reasonable doubt, that the facts and circumstances are true, etc. The *precise* hour at which the homicide may have been committed was not the material thing, nor was the condition of the body, whether cold or warm, controlling. These were circumstances to be considered by the jury, but they were not necessarily conclusive, and hence it was not error for the court to charge the jury, as was done in the twelfth and thirteenth instructions, that if they believed, to the exclusion of all reasonable doubt, that appellant committed the homicide as charged in the indictment, the precise hour at which it may have been done, and the condition of the body as to being cold or warm, were immaterial.

The ninth, tenth, eleventh and twelfth instructions refused relate to the tracks in the snow and the weight to be given to circumstantial evidence. Every question of law embraced in these instructions is embraced and specifically stated in the eighth and ninth given by the court; and, as we have before observed, the rule is there stated very favorably to the defendant.

This is not a case like that of *Carpenter* v. *State,* 43 Ind. 371, cited by appellant, where the instructions by the court "were merely general rules or declarations of general prin-

ciples, stating nothing specific or specially applicable to the evidence before the jury." Here the instructions by the court are specific and applicable to the evidence. This is a case clearly within the rule laid down in the case of *Fitzgerald* v. *Jerolaman,* 10 Ind. 338, and the numerous cases following it, that where the substance of an instruction refused is covered by one given, such refusal is harmless. The thirteenth, fourteenth, fifteenth and sixteenth instructions refused, so far as they contain a correct enunciation of the law, are covered by the ninth and other instructions given by the court. Some of them, also, are in direct conflict with the case of *Wade* v. *State, supra.*

Some question is made as to other instructions refused; in other words, it is stated in the brief that they should have been given. We have examined them all with care, and without extending this opinion to set them out, or the substance of them, it is sufficient to say that they are covered by the instructions given by the court.

The State proved by a Mrs. Sloan that some four years before the homicide she went to appellant's house, and on nearing it, heard appellant and his wife quarrelling; and that looking through an open door, she saw appellant strike her. The witness stated further, as follows: " He raised up his hand and slapped her, and he says, ' God damn you, I will kill you ; ' and he raised up his hand and she fell on the floor, and he raised his foot up, like he was going to stamp her, and I ran; he did not kick her, or anything, but raised up his foot like he was going to."

The State also proved by one Pease, a justice of the peace, that in July, prior to the homicide, the wife filed in his court an affidavit against appellant for assault and battery upon her; and that after appellant had paid his fine on a plea of guilty, he asked the wife to return home with him, and that she said she was afraid to go back, and that she would not do it.

All of this evidence was objected to by appellant, on the

ground that it was incompetent, irrelevant and immaterial, and too remote as to time and otherwise. It was admitted by the court, as stated, for the purpose of showing the relations between the parties, and for the purpose of showing malice, and for no other purpose.

We think that the evidence, for the purpose admitted, was clearly competent. The charge here is murder in the first degree, a necessary ingredient of which is premeditated malice. Evidence that appellant and his wife had had frequent quarrels, that he had at different times assaulted and beat her, and threatened to kill her, was competent evidence to go to the jury, to be considered by them, in connection with the other evidence in the case, in determining as to whether or not there was such premeditated malice. The fact that these quarrels, beatings and threats had extended through a series of years, would not weaken the evidence nor render it incompetent, but rather strengthen it. 3 Greenl. Ev., section 145, and cases cited; 1 Archb. Crim. Pr. and Pl. (Pomeroy's notes), p. 747, and cases cited; Whart. Crim. Ev., 9th ed., sec. 789, and cases cited; *Jones* v. *State, supra; Doolittle* v. *State*, 93 Ind. 272.

We have now examined all of the questions discussed by counsel, or pointed out by them, except that in relation to the sufficiency of the evidence. It must be apparent from the evidence that we have set out in this opinion, that, under the well settled rule, we can not disturb the verdict on the weight of the evidence.

After a careful and patient examination of all the questions to which our attention has been called, and with a keen sense of the responsibility resting upon us in a case involving the life of a fellow being, we are constrained to hold that there is no error in the record for which the judgment should be reversed. The judgment is, therefore, in all things affirmed.

Filed Oct. 28, 1884.   Petition for a rehearing overruled Nov. 30, 1884.