## MICHAEL J. SYNON

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed February 20, 1901.*

1. CRIMINAL LAW—*when remarks by judge during trial will reverse.* Harsh remarks by the judge to the accused, in the presence of the jury, will work reversal where they are of such a character as to impress the jury that in the opinion of the judge the accused was making orations and arguments instead of testifying; that he was misbehaving as a witness, was recalcitrant and exhibiting a disposition to willfully disobey the admonitions of the judge, when, in fact, there was nothing in the language or conduct of the accused to justify such harsh treatment.

2. SAME—*what evidence competent in murder trial.* One accused of wife-murder may prove any fact or circumstance tending to show that the crime was committed by another person than himself, and hence may show that another man boarded with the family at the time of the murder; may show his relations with the family, his opportunities to know that the wife carried money, and other pertinent circumstances.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

At the May term, 1900, of the criminal court of Cook county, Michael J. Synon, the plaintiff in error, was convicted of the murder of his wife and sentenced to suffer the penalty of death. At a former term of this court a *supersedeas* was granted, and the case is now before the court for review on writ of error.

The plaintiff in error was a plasterer by trade, and resided with his wife, Avrill E. Synon, and his son Michael H. Synon, a lad of ten years, at No. 240 Green street, in the city of Chicago. He had another son, Robert, then upwards of twenty-six years of age, who sometimes lived with his parents, but, as the evidence tended to prove, was at the time of the murder in the Cook County Hospital. The evidence also showed that a man by the name of Tom Smith had at the time of the murder been board-

ing in the family of Synon for about three weeks. The plaintiff in error was out of work and was then earning nothing, except a small amount which he received from the plasterers' union of which he was a member, but his wife earned and received money from sewing, and making mattresses filled with excelsior. The latter material she had piled up several feet high in a closet on the south side of the room used as a kitchen, near its southeast corner. The family lived on the second floor of the house,—a sort of flat,—and there was access by a front door opening outward and facing west on Green street, and also by a back stairway leading up from the back yard along the rear or east end of the house to a porch on the north side of the kitchen. Besides the kitchen there were two front rooms, which were furnished, and one of them had some furniture stored or piled in it.

The evidence shows that on Monday morning, February 26, 1900, there were in Synon's house, himself, his son Michael and said Tom Smith; that after breakfast Smith left the house at about seven o'clock, and nothing more was shown concerning him. The boy, Michael, or Mickey, as he was sometimes called, left about eight o'clock for the school which he was attending. He testified that before he left, his father asked his mother for some money for car fare, and that she took a nickel from a brown pocket which she had tied around her and gave it to him; that she had then in that pocket some paper money wrapped up to pay rent with that morning—some bills, which she counted; that she kept the paper money in one corner of it and some pennies and gold in the other. He further testified that his mother was well, and that there was no trouble that morning, before he left, between her and his father; that he came home from school at twelve o'clock; that he went up the back way and found the door locked; that he looked in at the window of the kitchen from the back porch and saw blood on the kitchen floor—dropped all around; that he did not see

his mother; that he then went to a neighbor's on the next
street to inquire about his mother and then went back
to school; that the teacher permitted him to go at three
o'clock, when he returned home at once, his home being
near, and found the kitchen door open but could not find
his mother, but saw that the blood on the floor had been
covered over with newspapers; that he then went out
and down to the street in front, and saw a hand rubbing
the frost from the middle front window of their rooms,
but could not see the person; that he then went again to
the neighbor's and stayed there about half an hour, and
then went back through the alley and met his father com-
ing through the alley and told him he could not find his
mother; that his father said, "All right; come up to the
house;" that they went up on the kitchen porch and his
father said he would fix the fire, and gave him a hatchet
to chop some wood, and said, "See if ma is around some-
where;" that he (witness) chopped up a barrel and half
of another and took up an armful of the wood and saw
his father was making a fire in the stove; that he went
back and brought up the second load and found the door
shut and he could not open it; that his father opened it
and said, "She is hurt, with her eyes closed," and told
him to bring up the rest of the wood, and he did so; that
his father opened the door and he saw his mother lying
on the floor with her head near the stove and his father
said she was dead, and witness went out on the porch
and "hollered," and his father said, "It was not me; you
need not say it was me, because it was not;" that his
father hollered too, and told him to holler; that a crowd
gathered and in a few minutes the police came. He also
testified that he asked his father about the blood on the
floor; that his father knelt down and put his finger in it,
and first said it was liver blood, but then said, "No, I
don't know what it is."

It further appeared from the evidence that when the
police officers came they found the body stiff; that death

had ensued seven or eight hours before; that the body was then lying with the head to the east, near the stove, so that, on opening the kitchen door from the porch, the door, when at right angles, struck the body about the knees; that plaintiff in error informed these officers that on coming home he found the body lying in the kitchen closet covered up with the excelsior, with the head to the . east and the feet out through the door, which was open, and that he picked it up in his arms and laid it down on the kitchen floor, gently letting the head down, resting on his left foot. Blood partly dried was found on the left leg of his trousers, near the foot, and on his left shoe, which fact he explained at the time, and as a witness on the stand, as above stated. A police officer noticed that Synon had something bulky in the left pocket of his coat, and asked him what it was, and Synon said it was his wife's money-bag, and that he took it from the top of the bureau. He handed it to the officer, who found therein a twenty-dollar gold coin, fifty-four pennies, some medals, nails, and an old coin, but no paper money. This money-bag was the brown pocket described by the boy, Mickey, as the one in which his mother carried her money.

The deceased was a small woman, about five feet three inches high, and weighed one hundred and five pounds. Her age was not shown. It was apparent that any one of her more severe injuries was sufficient to produce immediate death. Her skull on the left side had been crushed by repeated blows with some hard, blunt instrument, one of the wounds being a round hole in the head about the size of an ordinary hammer or blunt end of a hatchet, and there was a deep wound in the neck, cutting the cartilage to the larynx. The nose was cut through and broken, and there was a deep cut on the right side, extending from the forehead back to the right ear, besides superficial cuts. The second rib was fractured at each end, as if by violent blows upon the breastbone or upon the center of the rib. There were also

bruises on her hands, indicating efforts on her part to protect herself. The coroner's physician testified that the skull was fractured in about ten different places, extending from the frontal bone to the posterior part of the head, and that the brain oozed from the wounds. There was found a good deal of blood, covered up by the excelsior, at the west end of the closet, which had evidently come from Mrs. Synon's head and neck, showing that when her body was placed in the closet the head was to the west, and not to the east, as Synon testified he found it. A pair of shears used in the family was found hanging up near the closet with blood and hair adhering to them, the hair corresponding to the hair clipped from the head of the deceased. There was also a hammer, a hatchet and a small ax in the room, and there was testimony that the hammer appeared to have been wiped off with excelsior, but there remained a clot of blood where the wooden handle entered the eye of the hammer.

The remains of the deceased were removed to the morgue, where they were photographed for identification, and Synon was taken in charge by the police. On his way to the police station, and after he was locked up, he was accused of the murder of his wife by different officers. Their testimony was, in substance: By one, that he asked Synon what he killed his wife for, and after the question was repeated he replied, "God knows! I have got to suffer for it; you ain't." To another he exclaimed, "My darling! some one killed my darling!" Another, the inspector, came into the police office and said to Synon, "I want to know, you old villain, why you killed your wife," to which Synon at first made no reply, but after its repetition he said: "If you say so I must have done it; I will have to suffer for it, not you."

Mrs. Louise Smith testified that at the time of the murder she lived in the east part of the second house south of Synon's, and that about a quarter before nine o'clock

that morning she stepped out of her back door and heard a scream, and after she had gone a few steps in the yard heard another scream; that she thought it was in the direction of Synon's house, which was about thirty feet away and which she could see, but did not know positively; that she knew the time, because her children went to school a few minutes after eight and this was about half an hour afterward, and she was getting ready to go north in the city.

Mrs. Dora Silverman testified that she lived on the second floor of the house next south of Synon's and was washing that Monday morning; that about eight o'clock her children started to school, and from ten to thirty minutes afterward she heard a noise like fighting,—like children fighting,—but did not see anybody; that she looked out of the back window and then went down the steps into the back yard, and saw Synon's dog on the top back step, almost against the kitchen door; that the dog was barking and crying in a strange way; that she had often heard the dog bark before, but never heard him cry like he did then; that she could see the dog but not the door, and did not see any one around there.

Mrs. Antonio Morley testified that for a year and a half prior to October, 1899, she lived on the first floor of No. 240 Green street, Synon living above, but that she moved away before the murder; that she often saw Synon beat his wife, and once saw him choke her, and that she had marks on her neck caused by such choking; that on that occasion his wife screamed and "came rolling down stairs," and Synon told his boy to get him the hatchet, but then promised his wife he would not "lick her" if she would come up-stairs; that they used to fight; that she would scream when he would whip her; that there would be a great noise overhead; that she saw Synon push her into the shed one day because she would not give him money; that she recognized the brown money-bag as the one carried by Mrs. Synon, and that a week before she

(witness) moved away she saw Mrs. Synon have a hundred dollars in bills in that bag.

Emma Doyle testified that she had lived at No. 238 Green street, next to Synon's; that there was only a three-foot walk between the houses; that she had a back room and could hear and see trouble between Synon and his wife; that Synon often struck and beat his wife and called her bad names,—sometimes because she would not give him money and sometimes because meals were not ready. The boy, Mickey, also testified that there was trouble once in a while between his father and mother; that he saw his father choke her in the summer of 1899, and a few days afterward saw him hit her on the head with a stick, and heard his mother say she would leave some day if he did not quit hitting her; that she would be tired of giving him money, but would be afraid to say anything and would throw it on the table.

The defendant below was a witness in his own behalf, and denied, in the main, the incriminating testimony of all the witnesses as to his statements and his conduct towards his wife. He testified that his wife was weak and would often have dizzy spells, when she would become unconscious for a moment and fall, and that he would catch and hold her, but never struck her. He further testified that he had had no trouble with his wife on the day she was killed nor at any other time; that Tom Smith left his house before he did; that he, Synon, left about eight o'clock and his wife was then alive and well; that Mickey was not in when he left; that he, Synon, walked out in town and at two minutes past eight o'clock was at the corner of Harrison and Halsted streets, and from thence went up Harrison to Fifth avenue, thence to VanBuren and thence to the House of David, on Clark street, where he remained the rest of the day—until a few minutes after four o'clock in the afternoon; that he looked at the clock opposite the House of David when he arrived there in the morning, and saw that it was

hardly twenty minutes past eight; that he had been
tyler of the plasterers' union for four years, and that
many plasterers and others employed in that line of
work were in the habit of going to that place, called the
"House of David," and he saw many of them there that
day, though he could give the names of but two or three
of them; that on his way home in the afternoon he no-
ticed the clock on Halsted street and it was half-past
four; that nearing home he saw Mickey playing with
another boy,—playing in a vacant lot on the alley and
Congress street; that Mickey called him and told him
he could not find his mother, and in response to questions
Mickey told him that he had been in twice and that she
was not in; that the door was open; that he had been in
at noon and since then, and could not find her; that he
and Mickey then ran across the lot and went up-stairs
through the front door, which was open, and he ran
through the house, quick, and said, "Mick, perhaps she
is in the bed-room," and then looked in the bed; that he
was fidgety and thought she had dropped down as she
had once on the street; that her head had troubled her
ever since she had a sunstroke; that he sent Mike down
to cut some wood, saying "she might be cold when she
comes." Continuing he testified: "I lit a fire. The little
lad brought up a little arm of wood and went down for
another. I went down to the cellar and we looked there
and saw no trace of her. I went up the steps again and
saw the dog scratching, and he was acting wild. It was
right facing the back door in the closet. There I saw
her knees exposed. I calls my child up and goes out on
the landing and hollers for all I was worth. I turns in
again and pulls excelsior off her. I looks down at her,
stoops down, places one hand under her neck and shoul-
der and the other under the waist and lifts her into the
kitchen. I laid her down by the table in the center of
the room, turned around and looked at the closet. I seen
the pocket. I knew it. I picked it off the floor and put

it on the edge of the bureau, beside the closet door. It fell off and I picked it up and put it in my pocket. The police came in and asked me, 'What is this?' I says, 'Can't you see what it is?' The police looked around and commenced questioning me, and I told them as I told the court here. I had nothing else to tell. God forbid that I would kill her—that I should murder her. She had been my wife twenty-seven years and had borne me thirteen children. Our relations had been more than friendly. The oldest and youngest child are living. I did not tell Officer Bullis, in answer to the question why I killed her, 'God knows! I will have to suffer for it.' I never struck my wife willfully. She was very weak and frequently fell, and I would sometimes have to get hold of her when we were out walking, and squeeze her."

On cross-examination he testified that she often got black and blue spots on her body and limbs by falling from dizziness, and said: "She worked some at needle work: She was as good a woman as ever had a pair of hands. She worked at home and took orders from storekeepers. I never interfered with her work or took a dollar from her in my life. When I come home the night of the killing I found her in the closet, with her head toward the east and her feet out, her head six or eight inches from the east wall. One of her feet was doubled up, the right one stuck out the door. I didn't see it till the dog scraped the excelsior off her. The closet door was not shut. If it had been I would have searched the closet. She was lying partly on her back and right side, her head doubled down on her shoulder. There was four to six inches of excelsior over her—all over her. When Mike and I first came into the house we came by the front way. The door was wide open. I ran when the boy told me the front door was wide open. The back door was closed. It had no lock on it, or, rather, there was no key to the lock and the lock was no good. Mike and I searched everywhere. I thought the blood on the floor was sheeps'

livers bought for the dog and the cats. The cats would fight for them and pull them all over the house. When Mike went out the back door he opened and closed it. I didn't talk to Mike when he come up with the wood. When I come up from the basement I left Mike down stairs. I don't remember to have seen the dog until I came up from the basement. When I saw the dog pulling the excelsior off her I pulled off the rest. I called to Mike to come up. He came in the kitchen and ran out and hollered. When Mike came in the kitchen I said to him, 'Your mammy is killed! your mammy is murdered!' I hadn't touched her at that time. He turned and ran out of the kitchen and yelled—run down stairs and screamed. I went on the porch and hollered. I saw the neighborhood was raised, so came back and lifted her and brought her out of the kitchen, my right arm round her waist my left arm around her neck. I laid her down where the officers found her, and put her head on my shoe. My foot was under her and I drew my foot away, like that. Her head struck my trousers. I eased her down. When I got her out of the closet I turned around and walked to the door and laid her down. I was not going to take her out doors. I saw the bag inside the jamb of the door of the closet, in the excelsior. I took all the excelsior off her. I carried her. I stood over her and looked at her for a minute or two, laid my hand on her, turned around, and looked where she had been lying and saw the bag. I heard no money rattle in the bag. I gave her five dollars the Saturday night before. I got it from the treasurer of the union on Saturday night in Cross Union Hall on Dearborn street, being three months' pay as tyler—two silver dollars and three dollars in bills. I hadn't earned any money that week. The week before I worked on Dearborn and on State. It was at the Saratoga I worked. I forget the name of the man who paid me. He has a place of business at Sangamon and Madison. I didn't wipe any blood off of my shoe or pants. I don't know

whether I ever saw the shears before or not. The hair shown me is my wife's. She had the finest silk hair you ever seen, your honor. I guess that was my hammer, but I never used it. I didn't tell the officers it was unnecessary to bring along the ax, hatchet and big knife, as they had nothing to do with it. The House of David is on the west side of Clark street, between Madison and Monroe. It is on the side of the Arcade. I stood in there occasionally when it was cold. I went down to the policy shop once in the morning about ten o'clock, but did not play. One of the plasterers went with me, named Alf. Tully. It was in the basement on the south side of the Arcade. The saloon is on the first floor, the policy shop right underneath. I drank nothing that day."

Upwards of twenty witnesses testified that they saw plaintiff in error at the House of David on that Monday —the day his wife was murdered. They remembered the day from having read on the following morning in the daily papers an account of the murder. One of these testified that he reached the House of David at 8:25 o'clock on that morning and saw Synon there on his arrival and until 11:30 A. M., when witness left. Another, that he arrived at the House of David at 8:45 o'clock that morning and then saw Synon there, and from that time until half-past one, and again just before three in the afternoon. This witness fixed the time also by the burning of a factory building, which he observed. Another testified, that passing the House of David on a street car on that morning between eight and nine o'clock, on his way to do a job of plastering, he saw Synon, whom he knew well, standing in front of the House of David talking with other men there, and waved his hand at him, and Synon asked him where he was going, and he told him he was going to do some patching. The House of David was a gathering place for plasterers. So many of these witnesses saw him at different times during that day that it appeared that Synon was there a number of hours,

from eight or nine o'clock in the morning to three or four o'clock in the afternoon, or at least for a part of that time. The evidence tended to prove that Synon could have walked from his house, at 240 Green street, to the House of David in upwards of twenty minutes.

Upon the motion for a new trial certain affidavits of newly discovered evidence were filed, which will be noticed in the opinion.

THOMAS D. KNIGHT, and GREGORY, POPPENHUSEN & McNAB, for plaintiff in error.

E. C. AKIN, Attorney General, (CHARLES S. DENEEN, State's Attorney, and BEN. M. SMITH, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

We shall consider first the contention of plaintiff in error that the verdict was against the weight of the evidence and was not sufficient to prove the defendant guilty beyond a reasonable doubt.

We might agree with counsel that the presence of blood on the left leg of Synon's trousers, near the shoe, and on the shoe as well, when he was arrested in the afternoon of the day of the murder, was reasonably explained by the act of Synon in removing, in the afternoon, the body of his wife from the closet where it had been placed in the morning, under the excelsior, to a place on the kitchen floor near the door,—which removal we think the evidence proved. The blood was not fully dry, and it does not seem unreasonable that it came to be there by contact with the remains half an hour or more before. The back of his left hand was also bloody, and any inference that might be drawn that Synon got this blood upon his hand, trousers and shoe in killing his wife, would have to be consistent with the theory that he carried these evidences of his crime upon the

public streets and into a public house, where he mingled
freely with a score or more of his fellow-men for the
greater part of the day before he returned to the scene
of his bloody crime.    Many of these men testified and
answered that they noticed nothing unusual about his
clothing, his appearance or manner that day while he
was at the House of David, while it was proved on behalf
of the People that the blood on his trousers and shoe
was quite prominent in color when it was observed by
the police officers in the afternoon.    It may well be said,
however, that the case as made by the People does not
rest to any considerable extent on this evidence.    We
shall not recite, in this connection, the facts contained
in the record tending to prove the guilt of the accused.
The substance of the material parts of the evidence is
contained in the statement of the case preceding this
opinion.

The evidence for the defense principally relied on is
that which tended to prove an *alibi*—that Synon was at
another place at the time of the murder, and could not,
therefore, have killed his wife.    In view of the evidence
for the People this evidence was chiefly important in its
relation to two periods of time of the day of the murder,—
that is, the early part of the forenoon after eight o'clock,
and the afternoon from about three o'clock to half-past
four.    The former period covered the time of the murder,
and the latter the time after the boy returned home from
school and found the kitchen door open, the blood on the
floor covered with paper, and saw from the front some
one inside rubbing the frost from the window.    If this
boy's testimony was true, some person was then in the
house; or if true in part, some one had been there since
the noon hour, when he found the door locked and saw
through the window the blood on the floor.    It is con-
tended on the part of the People that Synon had returned
home unseen by any one and entered the house, covered
the blood with newspapers, and on hearing his boy come

in had secreted himself, and when his son went out had rubbed the frost from the front window that he might observe his movements until he was out of sight, and that then he, Synon, left the house and afterwards returned in such a way that the boy would note his coming then for the first time. Whether such an inference could be safely indulged depends upon all of the evidence bearing upon the question, including, of course, the testimony of the witnesses who testified that they saw him at the House of David during that time,—some as late as half-past three, and one who testified that Synon left there at ten minutes to four. As to the period in the morning there was testimony of different witnesses that he was at the House of David during all of the forenoon after twenty-five minutes past eight o'clock. The jury saw and heard all of the witnesses testify, and the weight to be given to the testimony of each was peculiarly a question for them, and in the face of the strong incriminating evidence adduced we are unable to say that the verdict was against the evidence or the weight of it. It is a matter of common observation that the most reliable witnesses may easily be mistaken as to a question of time. Clearly, however, the gravity of the case and the circumstantial and conflicting character of the evidence were such as to require of the court great care and caution in conducting the trial.

It is assigned for error that the court made improper remarks to plaintiff in error, and in the presence of the jury, while he was testifying as a witness in his own behalf, and thereby prejudiced him and his defense before the jury, and refused to admit proper evidence in his behalf. To support these assignments of error reference is made to the record, which shows, in substance, the following:

Plaintiff in error testifying: "My little lad had been down to the back of the yard, crying. He (a neighbor) says, 'Come up, Mike,' and he said, 'I will—

"Mr. Smith:   I object.

"The court:   It is not competent; just omit that.

"The witness:   Omit that, your honor?

"The court:   You do what I say; don't go telling what happened in your absence.

"Mr. Knight:   Did you kill this woman, Mike?

"Witness:   Me kill her?

"The court:   Answer the question.

"Witness:   God forbid I would kill her.   *   *   *

"Mr. Knight:   This man Tom Smith, who was he?   Do you know?

"Mr. Smith:   I object.

"The court:   I don't see how that is important.

"Witness:   Do you want me to tell as much as I know?

"Mr. Knight:   It was brought out by the State that a man by the name of Smith boarded there.   I want to know who he was.

"The court:   I don't care who he was.   (Record shows exception to the ruling of the court.)

"Mr. Knight:   Do you know this man, Tom Smith, was a penitentiary convict or not?

"The court:   That you need not answer.   (Record shows exception.)   As I said a little while ago, we are trying this man.   I don't think you will try Tom Smith here.   While the suggestion has been made a good many times that we try everybody, almost, except the man on trial, I always thought that we would try the man who is indicted.

"Mr. Knight:   Sometimes a man's defense is to attack, your honor.

"The court:   If this story is true, that he was not there and don't know anything about it, I don't think he is in a position to throw his defense on Smith to any extent.

"Mr. Knight:   He may know who Tom Smith was.

"The court:   Yes, he may know who John Jones was, and so all along the line."

Again, when plaintiff in error, as a witness, was being cross-examined, the record shows the following:

"Mr. Smith: Why didn't you let her live?

"Witness: I didn't kill her, sir. It is pretty hard for you to tell me that. Your honor, why should this man ask me that question?—a broken-hearted, poor, lonesome, destitute man? I can tell you I am a poor, unfortunate man. I was never in court in my life before. Never in my life before was I beside the judge's bench.  *  *  * I lived in Cleveland, Ohio, ten years. I did not have to leave Cleveland. No, sir; why should I have to leave it?

"The court: Synon, you would get along better if you would just answer the questions put to you and let the lawyers make the orations.

"Mr. Smith: You didn't have to leave Cleveland?

"Witness: Why?

"Mr. Smith: That is what I want you to tell the jury.

"Witness: No. Will your honor excuse me and allow me to answer this gentleman?

"The court: You sit down and answer the questions.

"Witness: I can't answer direct.

"The court: Sit down and answer the questions. We have had enough of this.

"Witness: Excuse me, your honor.

"The court: Now behave yourself. It is the province of the witness to answer questions. Do you hear what I say?

"Witness: Yes, your honor. I left Cleveland because I got a job here at more money."

Later, while plaintiff in error was testifying, the court said to him, "I think you had better answer the questions and leave the argument to your counsel."

While the record shows there was a disposition on the part of plaintiff in error, while testifying as a witness, to argue his cause and to make unnecessary excuses because of his ignorance, still we cannot avoid the conclusion that the language of the presiding judge, and his

bearing toward the plaintiff in error as it is indicated by such language, were unnecessarily harsh, and injurious and prejudicial to plaintiff in error and to his defense before the jury. True, plaintiff in error was a witness and subject to the rules applicable to other witnesses; but he was something more,—he was himself on trial for a capital crime, and was entitled, as in other criminal prosecutions, to the presumption of innocence until his guilt was proved in the manner provided by law, and to have his testimony go to the jury without unfavorable comments by the court. Any apparent disfavor exhibited toward him by the court, in the presence of the jury, would have a much more prejudicial effect in their minds on his defense than it would have if shown to any other witness. As said in *Conkhite* v. *Dickerson*, 51 Mich. 277: "Jurors are very vigilant in scrutinizing all that is said by the trial judge in the progress of a cause before them, and great care should be observed that nothing is said which can be construed to the prejudice of either party." And in *Wheeler* v. *Wallace*, 53 Mich. 355, it was said: "It is possible for a judge, however correct his motives, to be unconsciously so disturbed by circumstances that should not affect him, as to do and say, in the excitement of a trial, something the effect of which he would not at the time realize, and thereby accomplish a mischief not designed." (See, also, 1 Thompson on Trials, 209.) And so, it seems to us, it was in this case. The jury might well have inferred from the language of the learned judge who sat in the trial of the case, that his opinion was that the plaintiff in error was making orations and arguments instead of giving testimony, and was also misbehaving himself as a witness; that he was recalcitrant, and showed a disposition to willfully disobey or disregard the directions or admonitions of the court. Such an impression conveyed to the jury by the presiding judge could not be otherwise than greatly prejudicial to the defendant and to his defense. Nor have we been able to find in the rec-

188—40

ord any language or conduct of plaintiff in error, while testifying as a witness, that justified such harsh treatment at the hands of the court. Doubtless few men, whether innocent or guilty, ignorant or learned, could testify as witnesses under such trying circumstances without being led at times into matters more of argument than of evidence, and if care and caution are to be observed in drawing inferences from such fault unfavorable to the accused, much more care and caution should be observed by the trial judge to avoid imparting such inferences so drawn by him, to the jury. We can not regard the matter complained of as a mere necessary incident of the exercise, with firmness, of the judicial authority in conducting the trial in an orderly manner. Such proper exercise of authority has always been approved by this court. Knowing the necessity of orderly proceedings in trial courts, courts of review are reluctant to interfere even where excessive severity is shown; but where the rights of parties are prejudiced and the question is properly raised, it is entitled to as full and fair consideration as any other.

It will be noticed, also, that the court clearly intimated to the jury—in fact practically so said—that the defendant's story as testified to by him, if true, was inconsistent with the knowledge of any fact on his part which might tend to prove that Tom Smith, and not he, committed the crime. In this the learned judge was manifestly incorrect. But even if correct, still, in stating such a deduction of fact to the jury he was invading the province of the jury, which body was the only trier of the facts.

We cannot avoid the conclusion that the acts of the court complained of were well calculated to have great and prejudicial influence with the jury against plaintiff in error in making his defense. It might be that in some cases the court could see that no harm could have resulted, but not so in this case; and we believe it to be

the duty of this court not only to express its disapproval of the practice indulged in, but to send this case back for another trial, even had no other error been committed.

But we are also of the opinion that the court erred in refusing to allow the witness to answer the questions referring to Tom Smith. If it were not permissible to prove, and as attempted, that Tom Smith was an ex-convict, it was certainly competent to prove that he was then boarding in the family; to prove his relations to the family; his opportunities to know whether the deceased had or carried money about her person,—in short, to prove any fact or circumstance which would have tended to show that another, whether Tom Smith or any other person than the defendant, committed the crime. It had been proved on behalf of the People that Tom Smith lived in the family, was there at breakfast the morning of the murder and left the house at seven o'clock, but nothing more was shown concerning him. We are unable to see upon what principle all further inquiry relative to him was denied to plaintiff in error. Besides, plaintiff in error was not required by law to confine himself, in adducing his evidence, to matters inquired about on behalf of the People. He was making his defense, and was entitled to bring into the evidence for the first time any fact having a legal tendency to establish his innocence. Tom Smith was not called as a witness, and it appeared by affidavit in support of a motion for a new trial that he had disappeared shortly after the murder. It also appeared by affidavits filed in support of said motion that John J. Ryan, shown to be a reputable citizen, passed Synon's house, going south on Green street, about 8:15 o'clock on the morning of the murder and saw a man go into the front door of Synon's house; that the man was not Synon, whom he knew, but a younger man, and that he noticed him more particularly because he had to step back on the top step to allow the door to open outward; that the man went in, the door was closed,

and he (Ryan) saw no one come out. The affiant, Ryan, also stated that he did not know the fact mentioned was of any importance and did not communicate it to any one until after the trial, but that it was true and that he would so testify. It appeared by affidavit that plaintiff in error ascertained for the first time after the conviction that Ryan knew of such fact. Affidavits stating other newly discovered facts were filed which we shall not further notice, but we are of the opinion that the showing made was sufficient to entitle the defendant below to a new trial, and that it should have been granted.

For the errors pointed out the judgment is reversed and the cause remanded. *Reversed and remanded.*