Keith v. State.

## KEITH v. THE STATE.

[No. 19,655.   Filed November 1, 1901.]

CRIMINAL LAW.—*Appeal.*—*Evidence.*—*Murder.*—The rule that the Supreme Court will not weigh the evidence applies to capital cases. *p. 383.*

SAME.—*Appeal.*—*Evidence.*—*Murder.*—Where, in a trial for murder, much of the evidence tending to establish the most incriminating circumstances was strongly controverted, it was for the jury to decide what facts and circumstances were proved beyond a reasonable doubt, and for them too to draw the inferences deducible therefrom, and if the inference of guilt was fairly to be drawn from the circumstances of which there was evidence, the Supreme Court should accept the findings of the jury, approved by the trial court, although other inferences might be drawn from the circumstances in evidence. *p. 383.*

SAME.—*Venue.*—*Murder.*—A verdict finding defendant guilty of murder will not be reversed because of failure of proof of venue, the indictment having been returned in a county other than the one in

Keith v. State.

which the dead body was found, where the probative force of the circumstances in evidence was to the effect that defendant killed deceased in the county in which the indictment was returned and cast her body in a well, and afterward removed it to a creek in the county in which it was found. *p. 383.*

CRIMINAL LAW.—*Murder.—Identity of Dead Body.*—Where, in a trial for murder, the body of the deceased was not found for several weeks after her death, it was proper to permit the father and other witnesses to testify as to the identity of the body. *pp. 383, 384.*

SAME.—*Misconduct of Jury.—Evidence.*—A verdict convicting defendant of murder will not be disturbed on appeal because of the alleged misconduct of three jurors who concealed the fact on their *voir dire* that they had formed and expressed an opinion as to defendant's guilt, where the trial court heard affidavits and oral testimony pro and con and overruled a motion for a new trial. *pp. 384, 385.*

SAME.— *Evidence.— Stenographer's Notes of Evidence before Grand Jury.*—A stenographer who took the testimony of witnesses before the grand jury that indicted defendant for murder may testify and read her shorthand notes at the trial. *p. 385.*

SAME.—*Evidence.—Threats of Third Persons.*—In the trial for the murder of a girl the court properly rejected the testimony of a witness that such witness was to marry the girl two days after the alleged murder was committed, and that on that day he was searching for her with threats to kill her if she did not marry him, where there was neither proof nor offer of proof of any overt act of the witness against the life of the girl. *p. 385.*

SAME.—*Evidence.—Irrelevancy.*—In a trial for murder the testimony of a witness that on a certain night about a month after the alleged murder, but before the body of the murdered girl was found, he heard blows, and a woman's voice begging some one not to strike her, coupled with an offer to prove that defendant was not present at that time or place, was properly rejected. *pp. 385, 386.*

SAME.— *Trial.— Instructions as to Admissions and Confessions.*— Where, in a trial for murder, evidence was introduced as to admissions and confessions made by defendant, the court properly refused an instruction embodying the reasons given in §214 of Greenleaf on Evidence why admissions and confessions are to be received with great caution, since some confessions are entitled to little credit, and others, deliberately made, are entitled to great weight, and the court cannot properly charge as a matter of law that the confessions in evidence belong to one class or the other. *p. 386.*

SAME.—*Murder.—Death Penalty.—Statutes.—Common Law.*—Section 1941 Burns 1894 provided that sentences of death pronounced in counties south of a named line should be executed by the warden at the prison at Jeffersonville. By the act of 1897 (Acts 1897, p. 69),

the name of the Jeffersonville prison was changed to the "Indiana Reformatory," and the officer in charge from "warden" to "superintendent." *Held*, that if the failure of the act of 1897 to prescribe when, where, how, and by whom death sentences should be executed impliedly repealed that part of §1941 Burns 1894 which named the time, place, manner and officer, the death penalty for murder as provided by the penal code would not be thereby abrogated, but would merely leave the court free to follow the common law in directing the execution of a sentence.    *pp. 386-389.*

CRIMINAL LAW.—*Murder.—Death Penalty.—Amendment of Statute After Verdict.—Ex Post Facto Law.—New Trial.—Modification of Judgment.*—Section 1941 Burns 1894 provided that sentences of death pronounced in counties south of a certain line should be executed at the Jeffersonville prison.  The act of 1897 changed the name of the Jeffersonville prison to "Indiana Reformatory" without making any provision for executing death sentences in such counties. On January 11, 1901, defendant was convicted of murder in the first degree, the verdict assessing the death penalty.  On January 28, 1901, a statute came into effect which provided that all death sentences thereafter pronounced should be executed at the Michigan City prison.  The court thereafter pronounced judgment directing that the sentence be executed in accordance with the act of 1901. *Held*, that defendant's motion for a new trial did not raise the question as to whether the act of 1901 was *ex post facto*, but that such question should have been saved by motion to modify the judgment. *pp. 386-389.*

From Gibson Circuit Court; *O. M. Welborn,* Judge.

Joseph D. Keith was convicted of murder, and appeals. *Affirmed.*

*F. B. Posey, D. Q. Chappell* and *C. W. Armstrong,* for appellant.

*W. L. Taylor,* Attorney-General, *C. C. Hadley, Merrill Moores* and *T. W. Lindsey,* for State.

BAKER, J.—Appellant is under sentence of death for murder.  The only assignment presented in briefs and oral argument is that the court erred in denying appellant's motion for a new trial.

The sufficiency of the evidence to sustain the verdict is questioned.  The State produced witnesses whose testimony

went to establish these facts and circumstances: In the autumn of 1899, appellant, a farmer in Warrick county, about forty years old, married, living with his wife and children, began a liaison with the deceased, Nora Kifer, daughter of a neighboring farmer, about eighteen years old, unmarried. In December they lived together two or three days at a hotel in Evansville, in Vanderburgh county, some twenty miles from appellant's home. From this time until April following, deceased stayed mainly in Evansville, sometimes in a brothel. During this period appellant paid out considerable money to her and on her account. Deceased was not discreet, and her intimacy with appellant became current gossip in the home neighborhood. It reached the ears of appellant's wife and caused trouble. Appellant also became fearful of a threatened action by deceased for her seduction. On Saturday evening, March 31st, deceased returned home from Evansville. On Monday appellant sought to see her, but failed. On Tuesday appellant sent her a note by his son Jesse, a lad in his teens. She destroyed the note, but, from the testimony of Jesse who helped deceased decipher it and from subsequent declarations of appellant, it read: "Lora, meet me at the bridge at dark." Deceased instructed the lad to tell his father "All right." In the late afternoon she donned her best clothes, rather gaudy and easily described, and started for the bridge. (This bridge crosses an old canal in a valley where darkness falls rapidly after the sun descends behind the adjacent hills.) She was seen to reach and pace back and forth upon the bridge at dusk. She did not leave either east or west along the road. South of the bridge is a wood. Adjoining this is a field in which, near the fence, lies an abandoned well, full of water to within a few feet of the surface, fenced off from the field with rails, overgrown with briars and bushes. That night of Tuesday, April 3rd, was the last time that Nora Kifer was seen alive. About eleven o'clock that night neighbor Hedges saw appellant approach-

ing his home along the road leading from the direction of the
bridge and old well. Upon seeing Hedges appellant stepped
from the middle of the road over to the fence. This was of
pickets about four feet high. Appellant failed to climb
over, but skirted along the fence, with averted gaze, until
he had passed Hedges. Hedges accosted appellant, but he
neither replied nor looked up. April 9th the mother of
deceased received a letter, postmarked at Evansville on
April 8th, reading: "Dear Mother: I start this Evening
for Schicago ona trip. I May be gone three months and
mite Six With a friend. I expect To have a fine Trip.
Do not be uneasy about me. From your Dauter, Lora."
Appellant was accustomed to call deceased "Lora". The
writing of the letter and envelope was identified as appel-
lant's. From this time until May 22nd appellant spoke to
nearly every one he met about the Kifers' receiving letters
from their daughter, that she was in a sporting-house either
at Evansville or Paducah or St. Louis, and that if she told
lies on people around Evansville like she had on him she
would be found in the creek with a stone around her neck.
Finally the father of deceased said to appellant that Nora
had not been heard from; that a letter, purporting to be
from her, had been received, but that it was in a man's hand-
writing; that plenty of men would swear whose writing it
was; and that he proposed to search for his daughter and
find her if alive. On the night of May 22nd William Black-
man was returning from Evansville. About five miles from
the canal bridge, about an hour after dark, he met a covered
buggy, top up, side curtains on, back curtain down, drawn
by a gray horse, proceeding toward Evansville. The horse
was "just flying", swerved wide in passing Blackman, and
never slackened speed so far as he could hear it. About
10 o'clock that night appellant arrived at a livery barn in
Evansville. He drove a gray mare, harnessed to a top
buggy. At 6 o'clock the next morning he had breakfast and
shortly afterwards left Evansville. That morning the body

Keith *v.* State.

of a woman was found in Pigeon creek, about two miles from Evansville, at the side of a bridge on the road leading towards the canal bridge and appellant's home. The body was near the middle of the creek in about four feet of water. The head and upper part of the body were submerged. The legs and lower part of the abdomen were out of the water. Around the neck was a rope, to which was attached a heavy stone. The stream was sluggish. The skull was found to be mashed in, particularly about the temples. The body appeared to have been dead from six to eight weeks and to have been submerged in water during that time. The hair and nails had all slipped off. The clothing on the body was that worn by Nora Kifer when she left home on April 3rd. (The slippers and some other articles were not on the body.) A birthmark and other physical characteristics were those of Nora Kifer. The father and others identified the deceased as Nora Kifer. That day appellant painted his buggy and washed the floor carpet thereof. Blood crystals were found in the carpet. An autopsy disclosed that the blood was yet fluid in the body. On the 25th appellant was arrested at his home in Warrick county and taken to Evansville. The officers permitted him to ride separately with his son Jesse. He told Jesse that if he was asked about the note he should say that he did not take any note. At the jail he was searched and a pair of cast iron knuckles were found on him. After giving forth many conflicting oral declarations, he made and signed a written statement to the effect that deceased had caused him so much trouble that he wanted to get her out of the way; that he sent the note making the appointment at the bridge to enable a peddler whom he had employed for that purpose to take her to Chicago; that the peddler returned and said he had taken her to Chicago; that he wrote the letter of April 8th to quiet her parents. The officers arrested a peddler answering the description given by appellant. When the peddler was brought into appellant's presence, he said "That is the

man". On the peddler's fearfully beseeching him not to accuse an innocent man of the crime, appellant laughed and said "You are not the man. I have wronged you". Appellant then told the officers that he had employed a man named Asbury to take deceased away. The officers replied that it was futile to try to deceive them further, that they had had a talk with his son Jesse, and that he was the man. Whereupon appellant replied "You need not look for outsiders any longer. If you will wait till to-morrow morning, after I have seen my wife, I will tell you who did it, where it was done, and all about it." In the morning, after consulting counsel, he refused to talk further. An aged aunt visited him in jail, and said: "If you are guilty, Joe, own it like a man and get the mercy of the court, but if you are not guilty, say so like a man." He replied: "She broke my peace at home and was getting away with all my money, and something had to be done." While in jail appellant attempted to arrange with fellow prisoners, and with other persons by letter, for proof of an alibi for himself and of the life and whereabouts of Nora Kifer after April 3rd. In the latter part of June some men were cutting wheat in the field between the old well and the highway leading to appellant's home. Two slippers were found, one about twenty-five yards and the other about seventy-five yards from the old well, now rainsoaked and muddy, which were identified as those worn by Nora Kifer on the evening of April 3rd. There were blood crystals on the rails about the well. After the water was bailed out, at the bottom were discovered a hammer, a pair of grab-hooks, which had been made by appellant and used about his farm, and human hair of the color, length and quantity Nora Kifer had when last seen alive. Against this proof on the part of the State, appellant introduced evidence that he was at home the entire evening and night of April 3rd. As a witness in his own behalf, he denied practically all of the admissions and circumstances adduced by the State. Much of the State's evidence tending

to establish the most incriminating circumstances was strongly controverted. But counsel are in error in assuming that, because this is a capital case, a court of review will undertake to weigh the evidence. No more in this than in any other case does the transcript bring up the voice, the appearance, the demeanor of the witnesses, including appellant; and these are matters that may have been controlling with the jury and trial court in determining the weight of the evidence and the credibility of the witnesses. It was for the jury to decide what facts and circumstances were proved beyond a reasonable doubt, and for them too to draw the inferences deducible therefrom; and if the inference of guilt was fairly to be drawn from the circumstances of which there was evidence, the appellate tribunal should accept the finding of the jury, approved by the trial court, although other inferences might be drawn from the circumstances in evidence. *Lee* v. *State,* 156 Ind. 541. Our opinion is that the verdict should not be disturbed on account of the alleged insufficiency of the evidence to sustain it.

Appellant argues separately that the venue was not proved. This is really a part of the question whether the evidence sustains the verdict. The venue, like other material averments of the indictment, must be proved beyond a reasonable doubt. The indictment was returned by the grand jury of Warrick county. The dead body was found in Vanderburgh county. From the latter fact, taken by itself, the presumption would be that the murder was committed in Vanderburgh county. But the probative force of the circumstances in evidence was to the effect that appellant slew deceased in Warrick county near the canal bridge on the night of April 3rd and cast her body into the well, where it lay until the night of May 22nd, when appellant removed it to Pigeon creek in Vanderburgh county.

Complaint is made of the court's ruling in permitting the father of deceased and other witnesses to testify that the body found in Pigeon creek was that of Nora Kifer. Coun-

sel contend that, if a dead body is mutilated or decomposed beyond recognition, the law forbids the witness to state whose body it is, and permits only a description of the similarities between the dead body and the person in life, requiring the jury to decide the question of identity. Identity may be a matter of opinion; if so, then too is the question whether a body is recognizable or not. To certain schools of metaphysicians the whole external universe may be an appearance merely, nothing real, nothing a fact. But the testimony of witnesses that appellant did this or that, the law accepts as statements of fact, and is compelled to, else enter an inextricable maze. Yet it may have been a case of mistaken identity or hallucination. Who was it that waited on the canal bridge at dusk on April 3rd? The witnesses were properly allowed to answer, Nora Kifer. Whose dead body was found in Pigeon creek? The hair and nails were gone; the skull fractured in many places; the eyes very deeply sunken; the nose somewhat mutilated; the flesh somewhat decomposed; the skin somewhat discolored. But there was the whole body; contour, size, age; shape of head and face; tapering fingers, double ankles, birthmark, a certain front tooth decayed; beyond all, that indefinable impression produced by the ensemble. To those witnesses, parent, relative, neighbor, there was no inability to recognize; on the contrary, they answered, and were properly permitted to answer, Nora Kifer's. The full purposes of justice were subserved, and all the elements of the problem brought before the jury, by allowing in each instance, concerning the dead body in Pigeon creek as well as the live body on the canal bridge, the widest cross-examination as to the reasons why the witnesses so answered. There was no error in the ruling. Wharton's Crim. Law (7th ed.), p. 747; 3 Greenleaf's Ev. (16th ed.), §133.

It is alleged that appellant did not have a fair and impartial trial by reason of misconduct of three jurors in this, that each had formed and expressed an opinion of appel-

lant's guilt and concealed the fact on his *voir dire* examination. This was disputed by the State. The trial court heard affidavits and oral testimony pro and con. We are not authorized to disturb its finding on conflicting evidence. *Hinshaw* v. *State,* 147 Ind. 334; *Hauk* v. *State,* 148 Ind. 238.

Appellant's objections to the court's action in permitting a stenographer to testify and to read her shorthand notes regarding the testimony of certain witnesses before the grand jury, are fully covered by the decision in *Higgins* v. *State,* 157 Ind. 57.

William Clark, a witness for appellant, was not permitted to testify that he was to marry deceased on April 5th and that on that day he was searching for her with threats to kill her if she did not marry him. There was neither proof nor offer of any overt act by Clark against the life of Nora Kifer. Evidence of isolated threats by third parties is not admissible. *Bonsall* v. *State,* 35 Ind. 460; *Jones* v. *State,* 64 Ind. 473; *Walker* v. *State,* 102 Ind. 502; *Davidson* v. *State,* 135 Ind. 254; *Siple* v. *State,* 154 Ind. 647; *Green* v. *State,* 154 Ind. 655.

Appellant offered to prove by Union Henon that, about May 1, 1900, at 9 o'clock at night, while he was on a highway four or five miles north of the Keith and Kifer neighborhood, he heard blows and a woman's voice begging some one not to strike or kill her, the sounds apparently coming from a place about seventy yards away. This was coupled with an offer to prove that appellant was not present at that time and place. If the prosecution fails to make a case, the defendant is not required to introduce any evidence. If the State makes a prima facie case, the defense is not limited to controverting the facts and circumstances proved by the State, but may bring forward any legitimate evidence to meet or throw doubt upon the State's case, including proof that another than the defendant committed

the crime under investigation. *Green* v. *State,* 154 Ind. 655. But proof of an assault at another time and place upon some person other than the deceased is irrelevant. The evidence on the part of the State pointed to no other time and place than April 3rd and the vicinity of the old canal bridge. This was what the jury had to believe in order to find appellant guilty under the evidence. But, on the part of appellant, there was neither proof nor offer that Nora Kifer was alive and in the neighborhood of the alleged assault on the night of May 1st. We do not find the case of *Synon* v. *People,* 188 Ill. 609, 59 N. E. 508, to be applicable to the facts here.

The court properly refused an instruction submitted by appellant in which were embodied the reasons given in section 214 of Greenleaf why "admissions and confessions are to be received with great caution". The weight and the credibility of the evidence of confessions in a given case are to be determined by the jury as facts. Some admissions or confessions may be entitled to little credit owing to confusion of the prisoner and the heedlessness or worse of the narrator. Other confessions, deliberately made, as Greenleaf says in section 215, "are among the most effectual proofs in the law". But the court can not properly charge as a matter of law that the confessions in evidence belong to the one class or the other. *Garfield* v. *State,* 74 Ind. 60; *Davis* v. *Hardy,* 76 Ind. 272; *Unruh* v. *State, ex rel.,* 105 Ind. 117; *Mauro* v. *Platt,* 62 Ill. 450; *Commonwealth* v. *Galligan,* 113 Mass. 202; *Castleman* v. *Sherry,* 42 Tex. 59.

Lastly, appellant challenges the correctness of this instruction: "If you find the defendant guilty of murder in the first degree as charged in the indictment, you have the right to fix his punishment at imprisonment for life or that he suffer death." From the organization of the Northwest Territory down to 1881, the penalty in this jurisdiction for murder in the first degree was death. Since 1881 the jury has had a discretion to fix the punishment at death or im-

prisonment in the state prison during life. Throughout the whole period of Indiana's existence as Territory and State, the death penalty has been named in the statute defining murder in the first degree; and the common law has been in force except as modified by constitutions and statutes. As appellant's punishment was not fixed at imprisonment, his complaint is necessarily limited to that part of the charge which informed the jury that they might assess the death penalty. The charge was correct, unless capital punishment in this State has been abolished by implication. Prior to 1897 there was a state prison south located at Jeffersonville and a state prison north located at Michigan City. In 1889 a statute was passed directing that sentences of death pronounced in counties south of a named line should be executed at the Jeffersonville and those north at the Michigan City prison. §1941 Burns 1894. Under this statute appellant should suffer death at the Jeffersonville prison. But in 1897, the name of the southern prison was changed to "The Indiana Reformatory" and the title of the officer in charge from "warden" to "superintendent". So far as imprisonment was concerned, the purpose of the institution was changed from the incarceration of male felons generally to that of those who were more than sixteen and less than thirty years old. Male felons over thirty years old were to serve their time at the northern prison, the name of which was changed to "The Indiana State Prison". Acts 1897, p. 69. The act of 1897 made no mention of the execution of death sentences. This was the state of the statutory law when the verdict in this case was returned on January 11, 1901, finding appellant guilty and assessing the death penalty. On January 28, 1901, a statute came into effect which provided that all sentences of death thereafter pronounced should be executed at the Michigan City prison. Acts 1901, p. 4. The court thereafter pronounced judgment and directed that the sentence be executed according to the provisions of the act of 1901. Appellant argues that, as to

him, the act of 1901 is an *ex post facto* law, and that the act of 1897 repealed the act of 1889 which prescribed when, where, how, and by whom death sentences should be executed. But the assignment is that the court erred in overruling the motion for a new trial. The motion sets forth various alleged "errors occurring at the trial". The particular ground to which the argument is addressed is that the court erroneously instructed the jury that they might fix appellant's punishment at death. The instruction was given, the trial concluded, and the verdict returned, before the act of 1901 was passed. The only question under the motion, therefore, was and is whether that part of the penal code which defines murder in the first degree and fixes the punishment at death was in force when the instruction was given. It is unnecessary to decide whether or not the failure of the act of 1897 to prescribe when, where, how and by whom death sentences should be executed, impliedly repealed that part of the act of 1889 which did name the time, place, manner and officer, because the express repeal of all legislation touching time, place, manner and officer would not abrogate the death penalty for murder, but would merely leave the court free to follow the common law in directing the execution of the sentence. Down to 1807, our statutes were silent respecting time, place, manner and officer. Laws of Northwest Territory, 1787-1802, ch. VI, §2, p. 98. The court issued its writ and the sheriff executed it. From 1807 to 1824, nothing was prescribed but the manner (hanging by the neck until dead), which was a mere affirmation of the common law method previously employed. R. S. Ind. Ter. 1807, ch. VI, §29, p. 39. In 1824 and 1831, the time was fixed, but no officer nor place was named. R. S. 1824, §65, p. 149; R. S. 1838, §76, p. 219. In 1843 (R. S. 1843, §70, p. 997), the sheriff was named. He was the proper officer by the common law. In 1852 (2 R. S. 1852, §134, p. 379) the place and the persons entitled to be present were named for the first time. In 1881 (§§1872,

Keith *v.* State.

1875 R. S. 1881), some changes were made in time and place. Then followed the legislation of 1889, 1897, and 1901, heretofore referred to. Just as, starting from none, the details of method have been built up, so they might be taken down, one by one, or collectively, without affecting the definition of murder and the infliction of the death penalty therefor. There was no error in overruling the motion for a new trial.

Since the oral argument and after the cause had been taken under advisement, appellant's counsel, probably having perceived that their attacks upon the law of 1901 and the part of the judgment which directs when, where, how and by whom the penalty shall be inflicted had not been duly presented to the trial court or here, have asked leave to file additional assignments of error with a view to having a basis for their attacks. At least two reasons forbid the granting of the request. The application comes too late. And there is nothing in the record on which to found the proposed assignments. The part of the judgment which sentences appellant to death is affirmatively approved. Appellant therefore can not successfully assail the judgment as an entirety. Having failed to move for a modification of the judgment with regard to the details of executing the sentence, appellant is unable to point out any ruling of the trial court on that subject for review.

Appellant procured a change of venue from the Warrick to the Gibson Circuit Court. The unusually voluminous record discloses that the trial was conducted with great care, zeal and ability by the respective counsel. A conservative and painstaking judge, who saw the witnesses face to face, pronounced the sentence, and no valid reason has been advanced why it should not stand.

Judgment affirmed.